WEST LUMBER CO. v. C. R. CUMMINGS EXPORT CO.   (No. 7192.) *

(Court of Civil Appeals of Texas.   Galveston. May 16, 1917.   On Motion for Rehearing, June 7, 1917.)

1. APPEAL AND ERROR ⬮══930(1)—JURY FINDINGS—EVIDENCE—REVIEW.

In reviewing the evidence tending to support the findings of the jury, the court must accept

as true that which most strongly supports such findings.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755, 3756, 3758.]

2. LOGS AND LOGGING ☞3(15)—CONTRACTS—MEETING OF MINDS.

In an action to recover for breach of a contract to convey timber, evidence *held* sufficient to support jury findings that there was a meeting of the minds of the parties as to the tract from which the timber was to be cut, the price, and the quantity and kind of timber.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 12.]

3. TRIAL ☞140(1)—QUESTIONS FOR JURY—CREDIBILITY OF WITNESSES.

It is the province of the jury to pass upon the credibility of witnesses and to give such weight to their testimony as they think proper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 334.]

4. APPEAL AND ERROR ☞1002 — FINDINGS BASED ON CONFLICTING TESTIMONY — REVIEW.

This court has no authority to substitute its findings for those of the jury upon conflicting evidence, although it might be of the opinion that the weight of the evidence is with the losing party.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937.]

5. TRIAL ☞251(4)—INSTRUCTIONS—ISSUES.

Where plaintiff pleaded a contract consummated by correspondence, conversation, and oral agreement, the court did not err in refusing defendant's requested charge that there could be no recovery unless a contract was made in a certain telephone conversation; there being no contention that all the details of the contract between the parties were mentioned in such conversation.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 591.]

6. FRAUDS, STATUTE OF ☞56(3) — CONTRACT FOR SALE OF TIMBER.

Where standing .timber is sold for the purpose of prompt severance within a reasonable or specified time with a mere license to enter and remove, the contract need not be in writing.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. § 86.]

7. LOGS AND LOGGING ☞3(15) — BREACH OF CONTRACT—MEASURE OF DAMAGES.

Where seller had notice that buyer was to manufacture timber purchased into lumber, and would suffer the special damages claimed by it, the court did not err in allowing as damages for breach by seller the difference between the contract price and the value of the lumber which could have been made out of the timber; the undisputed evidence being that buyer did not have sufficient timber to keep its mill running.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 12.]

8. EVIDENCE ☞332(3)—PLEADINGS IN PRIOR SUITS—ADMISSIBILITY.

In an action for breach of a contract for the sale of timber, buyer's petition in intervention in a previous suit against the seller, as limited by the instruction of the court, was properly admitted for the purpose of proving that seller had notice of buyer's insistence on performance in time to carry out the contract and prevent the damages claimed.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1239.]

9. SALES ☞416(2)—LETTERS WRITTEN SUBSEQUENT TO SALE—ADMISSIBILITY.

Letters written subsequent to the making of the contract giving seller notice that delay in delivery of timber was causing damage to buyer, were admissible, where damages thereafter accrued by reason of the continued refusal of seller to perform.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1172.]

10. LOGS AND LOGGING ☞3(15)—BREACH OF CONTRACT TO DELIVER—DAMAGES.

Although seller had no notice at inception of contract to deliver timber of special damage from breach, he would be liable therefor if after timely notice he failed to perform.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 12.]

11. LOGS AND LOGGING ☞3(15)—BREACH OF CONTRACT TO DELIVER — DAMAGES — EVIDENCE.

In an action for breach of a contract to deliver timber, issue whether buyer could have purchased such timber for profitable use of its mill from others was properly submitted, where, if timber had been delivered, it would have been manufactured.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 12.]

12. LOGS AND LOGGING ☞3(15)—BREACH OF CONTRACT TO DELIVER — DAMAGES — EVIDENCE.

Where the capacity of buyer's mill would have handled all the timber contracted for, in addition to the timber secured from other sources, the timber manufactured could not be considered to minimize damages for breach of defendant's contract to deliver.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 12.]

13. EVIDENCE ☞474(1)—CONCLUSION OF WITNESS—ADMISSIBILITY.

In an action for breach of a contract to deliver timber, where the witness testified that he was familiar with timber which would be accessible to buyer's mill, having been all over the available territory and used every effort to secure timber of the kind contracted for. his statement, based upon the experience he had had in that territory, that there was no other timber of the kind contracted for available, and that he knew of no effort on his part left undone to supply the mill with proper material, was properly admitted.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2196, 2205, 2207.]

On Motion for Rehearing.

14. TRIAL ☞194(1) — INSTRUCTION—WEIGHT OF EVIDENCE.

The instruction of the court not to consider a plea in intervention, filed in a former suit and admitted in evidence, as a statement of any fact, was not a charge upon the weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439, 440, 450.]

Appeal from District Court, Harris County; John A. Read, Judge.

Suit by the C. R. Cummings Export Company against the West Lumber Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, C. L. Carter, and W. A. Parish, all of Houston, for appellant. Hutcheson & Hutcheson, of Houston, for appellee.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

LANE, J. This suit was instituted by C. R. Cummings Export Company, hereinafter called the Export Company, against the West Lumber Company, hereinafter called the Lumber Company, to recover damages for the breach of an alleged contract for the sale of certain timber standing on four tracts of land situated in Polk county, Tex., belonging to said Lumber Company.

Plaintiff alleges that on or about the 16th day of September, 1913, plaintiff began negotiations with the defendant for the purchase of certain ash and cottonwood timber on a small tract of land in Polk county, Tex., near the mouth of Long King creek, in said county; that as a result of said negotiations further negotiations were entered into between plaintiff and defendant, and a contract was thereby effectuated between plaintiff and defendant by the terms of which defendant agreed to sell to plaintiff, and plaintiff agreed to purchase from defendant, all ash and cottonwood timber on certain described tracts of land in Polk county, setting out by metes and bounds four certain tracts of land.

It was further alleged that the contract was evidenced in part by certain correspondence and in part by verbal transactions; that in all of the transactions it was understood and agreed that the timber was intended for immediate use and prompt severance, and that plaintiff especially desired it for the winter season of 1913 and 1914, for the purpose of manufacturing it into lumber, which fact was known to defendant; that the plaintiff and defendant made an agreed estimate of the timber; and that such estimate was accepted by both parties, but that defendant refused to carry out the contract. The petition then set forth allegations that the mill of the plaintiff was located away from railroad connections; that defendant and its agents and officers had knowledge of these facts; and that plaintiff was unable to obtain other timber, and therefore suffered a loss of its profits, for which the suit was brought.

The defendant answered by general demurrer, special exceptions, general denial, special denials, and a special defense to the effect that, standing timber being a part of the real estate, and the alleged contract not being in writing, same was void under the statute of frauds. By trial amendment the defendant alleged that, if a contract had in fact been made, the same was breached by plaintiff by reason of its attempting to add terms thereto after the agreement had been reached.

The case was tried with a jury, to whom was submitted the special issues, which, together with the answers of the jury thereto, are set out as follows:

"Issue No. 1. Was there or was there not a meeting of the minds of the parties plaintiff and defendant as to the particular tracts of land from which the timber was to be sold? Let your answer be 'There was,' or 'There was not,' according as you find the fact to be. If you answer that there was, then state when the minds of the parties first met in this particular. Answer: There was when the joint estimate was agreed on.

"Issue No. 2. If you have answered issue 1 in the affirmative, then answer the following: What particular tract or tracts of land, if any, were agreed upon by the parties, describing them in a general way, the best you can, and state when the minds of the parties first met as to all the tracts, if any, that you find they agreed up. Answer: On all tracts on which joint estimates were made.

"Issue No. 3. Was there or was there not a meeting of the minds of the parties, plaintiff and defendant, as to the price to be paid for said timber? Let your answer be 'There was,' or 'There was not,' according as you find the fact to be; and if you say there was then name such price agreed upon, and also state when the agreement with reference to said price was first reached, as to these tracts. Answer: There was for ash $6; cottonwood, $2.50.

"Issue No. 4. Was there or was there not a meeting of the minds of the parties, plaintiff and defendant, with reference to the quantity of timber to be sold? You will answer this question by saying 'There was,' or 'There was not,' according as you find the fact to be. If you find there was a meeting of the minds of the parties as to the quantity of timber to be sold, then you will please state what the quantity was and state how and when this quantity was arrived at, and state when such meeting of the minds of the parties first occurred as to each of said matters. Answer: The letter of October 24, 1913, subject price, joint agreement on estimate accepting price. There was all the ash and cottonwood on the four tracts by joint estimate, when joint estimate was agreed on.

"Issue No. 5. If you have answered either the first, third, or fourth issues in the negative, then you need not answer this issue. If you have answered all of said issues in the affirmative, then answer the following: Could and would the plaintiff, as alleged by plaintiff, have manufactured said timber into lumber at a profit? If you answer this in the negative, let your answer be 'No.' If you answer in the affirmative, then answer, 'Yes,' and state the amount of profit which you find plaintiff would have so made therefrom. Answer: Yes.

Profit on ash, $9.25 M.............. $3,510 75
"          " C. Wood, $4.65 M...... 1,126 23
                                     ──────────
                                     $4,636 99

"Issue No. 6. If you have answered either the first, third, or fourth preceding issues in the negative, then you need not answer this issue. If you have answered all of said four issues in the affirmative, then answer the following: (a) Was there or was there not on the market available to plaintiff, timber which it could, in the exercise of reasonable diligence, have secured and manufactured at a profit, and which would have reduced its damages, if any, claimed in this suit? If you have answered the above in the negative, then let your answer be 'No.' If you have answered the above in the affirmative, then let your answer be 'Yes,' and in said event you will also answer the following: (b) State to what extent said damages could have been reduced, that is to say, what amount is to be deducted from such damages stated in answer to issue 5. Answer: (a) No."

"Issue No. 7. If you have answered either the first, third, or fourth issue in the negative, then you need not answer this issue. If you have answered all of the said issues in the affirmative, then answer the following: State whether or not, in the light of information had by defendant, the defendant was, in the exercise of reasonable care, chargeable with knowledge of the intention of the plaintiff to use the timber referred to in plaintiff's petition in its

mill at Wallisville for manufacturing purposes. If you answer in the negative, then let your answer be 'No.' If you answer in the affirmative, then say 'Yes,' and state when you find defendant was first chargeable with such knowledge. Answer: Yes; on receipt of letter of September 27, 1913, written by Cummings Lumber Company to McDowell.

"Issue No. 8. If you have answered either of the first, third, and fourth issues in the negative, then you need answer this issue. If you have answered all of said issues in the affirmative, then answer the following: Did or did not the defendant at any time have knowledge of such facts as would put defendant on notice that plaintiff would likely, by reason of failure to secure said timber, suffer damage because of not having such timber in question for manufacturing into lumber at its mill at Wallisville? If you answer this question in the negative, let your answer be 'No.' If you answer in the affirmative, then say 'Yes,' and state when defendant first acquired such knowledge. Answer: Yes; on receipt of letter of February 19, 1914, written by plaintiff's attorneys.

"Issue No. 9. During the milling season of 1913–14 was there or was there not ash and cottonwood timber other than that involved in this suit and other than that actually used by plaintiff which the plaintiff could have purchased for the profitable use of the Wallisville mill? You will answer 'There was,' or 'There was not,' according as you find the fact to be. Answer: There was not."

Upon the evidence and findings of the jury judgment was rendered in favor of the plaintiff for $4,636.99. From this judgment defendant has appealed.

By appellant's assignments 1 to 8, inclusive, it is insisted that the court erred in entering judgment in favor of appellee upon the findings of the jury because there is no evidence to support the findings: (a) That there was a meeting of the minds of the parties, plaintiff and defendant, as to the particular tracts of land from which the timber was to be sold so as to constitute a contract; (b) as to the price to be paid for the timber; and (c) as to the quantity of timber to be sold. It is also insisted by the assignments that the findings of the jury on such issues are against the great weight and preponderance of the testimony, and therefore manifestly wrong.

[1] To undertake to call out all the testimony tending to support the findings of the jury complained of in assignments 1 to 8, inclusive, and set it out herein verbatim, would require the writing of an opinion inexcusably long, as the testimony with reference to making the contract covers about 100 pages or more of the statement of facts. We shall therefore, in the main, content ourselves by stating our conclusions as to what such testimony shows. And in reviewing the evidence tending to support the findings of the jury we must accept as true that which most strongly supports such findings.

The evidence shows that J. M. West is the president of the West Lumber Company and owns most of its stock; that in his dealings in the matters involved in this suit he acted within the scope of his authority; that Dr. J. S. McDowell and A. B. Garvey were agents of said company, and in dealing with such matters were also acting within the scope of their authority, and that such acts as either of them performed in relation to the questions involved herein were the acts of the Lumber Company; that C. J. Robertson was the agent of the Cummings Export Company and acted for said company in its negotiations with said Lumber Company concerning matters involved in this suit.

It is further shown by the evidence: That on the 16th day of September, 1913, C. J. Robertson, for the Export Company, by letter inquired of J. M. West, of the Lumber Company, if his company desired to sell the ash and cottonwood timber on a small tract of land owned by it, situated near the mouth of Long King creek, in Polk county, Tex. To this inquiry West, for the Lumber Company, replied, directing Robertson, for the Export Company, to take the matter of inquiry up with Dr. McDowell, agent for the Lumber Company, who he said had charge of the company's land. That on the 27th day of September, 1913, Robertson, for the Export Company, wrote Dr. McDowell that he had been advised by Mr. J. M. West to write him in regard to the ash and cottonwood timber on said small tract of land, and also asked if the Lumber Company wished to sell the cottonwood and ash from any other tracts of its lands. That Dr. McDowell was also advised by this letter that the Export Company would be willing to buy the ash and cottonwood timber on one or more tracts of land, either by the 1,000 feet or on an estimate of the gross amount of timber thereon. In this letter it was said:

"We have numerous outfits working on the river putting out these classes of timber, which we cut at our mill."

That on October 8, 1913, Dr. McDowell wrote Mr. J. M. West that the Export Company wanted to buy the ash and cottonwood on the small tract near the mouth of Long King creek, and asked West to give him his prices on the same, so that he (McDowell) might price it to the Export Company, and to this letter West replied:

"I see no reason why we should not submit these people a price on this particular timber, but I am not posted * * * as to the value of this particular character of stuff, and suggest you find out about what this timber is selling at, and make them a price accordingly. They had this matter up with me once before, and seemed to be overly anxious to purchase it, and I am pretty sure we can get a good price from them."

That on October 14, 1913, Dr. McDowell wrote the Export Company, in reply to its letter of the 27th of September, that West had authorized him to sell the ash and cottonwood on the tract at the mouth of Long King creek, and that they would take $6 per 1,000 feet for the ash and $2.50 per 1,000 feet for the cottonwood on that tract, and that, if those prices would interest it, to let him know, and then they would meet on the

ground and make an estimate of such timber. That on the 20th day of October the Export Company replied to Dr. McDowell's letter of October 14th, and stated to him that it had 10 or 12 teams which it would like to move up the river to get timber, but that it could not purchase ash and cottonwood on the small tract near the mouth of Long King creek only, as there was not enough of such timber to justify the removal of its teams. It said further that it was willing to give $6 per 1,000 feet for ash if the quality and location of the timber justified such price, and there was enough of it to interest it. It suggested that there might be enough of such timber on other lands owned by the Lumber Company south of the railroad to interest it, and to justify the removal of its teams. It then asked that it be advised if the Lumber Company wished to consider the sale of the ash and cottonwood on all the tracts mentioned at $6 for the ash and $2.50 for the cottonwood, and stated that, if the Lumber Company wished to make such sale, Robertson would arrange a date to meet Dr. McDowell on the ground and go over these tracts.

There is evidence tending to show that the Lumber Company authorized McDowell to sell to the Export Company all the ash and cottonwood timber on the four tracts of land owned by it lying above the Houston East & West Texas Railroad which had been cut over by stavemakers, at a price of $6 per 1,000 feet for the ash and $2.50 per 1,000 feet for the cottonwood; that it was understood between the parties to the contract what tracts were considered as having been so cut over, and that the four tracts from which the Export Company contends it bought such timber were the tracts considered by all the parties; that a joint estimate of the amount of the timber, on said four tracts was made by the parties as agreed upon, by which the amount to be paid by the Export Company to the Lumber Company was to be ascertained; that after said estimate had been made the Lumber Company was furnished with the same; that C. J. Robertson, for the Export Company, called upon West to pay the value of the timber as agreed upon; and that the Lumber Company, through its president, refused to accept payment and conclude the contract.

[2] While we think the evidence tending to show that the minds of the contracting parties met on tracts of land from which the timber was to be taken, and that there was a specific offer of sale at a specific price by the Lumber Company, and that said offer was accepted by the Export Company, is weak, it is sufficient to warrant the jury's findings that the tracts of land from which such timber was to be taken were agreed upon; that the price to be paid by the Export Company was also agreed upon; and that the timber sold was all the ash and cottonwood on the four tracts described in the plaintiff's petition.

[3, 4] It is the province of the jury to pass upon the credibility of the witnesses, to give to their testimony such weight as they think it entitled to, and to settle all issues made by the conflict in such testimony, and this court has no authority to substitute its findings for that of the jury upon conflicting evidence, although it might be of the opinion that the weight of the evidence is with the losing party. We therefore overrule assignments 1 to 8, inclusive.

[5] It is insisted by the ninth assignment that the court erred in refusing to give to the jury appellant's twenty-seventh requested charge, to the effect that before they could find for plaintiff they should believe from a preponderance of the evidence that C. J. Robertson, for the Export Company, and J. S. McDowell, for the Lumber Company, were duly authorized to contract for the purchase and sale of the timber in question by their respective principals, and that said parties, by the telephone conversation alone which passed between them on or about November 18, 1913, did enter into a contract for the purchase and sale of said timber upon the particular tracts described in plaintiff's petition, and that there was a meeting of the minds of said parties in said conversation upon all of the essential terms of the alleged contract: (1) As to the identity of the tracts of land from which the timber was to be sold; (2) as to the price at which the timber was to be sold; (3) as to the quantity of timber to be sold; (4) as to the time within which payment was to be made therefor; and (5) as to the method by which the transfer of the timber was to be made.

The court did not err in refusing the charge. There is no contention that all the details of the contract between the parties were mentioned, or that the contract was wholly consummated by or through such conversation, but, to the contrary, plaintiff pleaded a contract consummated by various correspondence, conversations, and oral agreements between the parties, and there was evidence tending to support such plea. The assignment is overruled.

By the tenth and eleventh assignments it is insisted that the trial court erred in entertaining plaintiff's suit and hearing evidence in support thereof, because it is shown by the petition that plaintiff is seeking to recover for the breach of an alleged contract for the conveyance of growing and standing timber; that the petition shows that said alleged contract was not in writing, but that it was partly in writing and partly verbal; that such contracts, to be enforceable, must be wholly in writing and signed by the party to be charged thereby; that the contract alleged is within the statute of frauds.

The contention under these assignments is that standing and growing timber is a part of the real estate, and that any effort to

establish a contract with reference to a sale thereof must be in writing and signed by the parties, or some one by their authority, or else such effort would come within the statute of frauds.

[6] The proposition contended for by appellant is not absolute. Where standing and growing timber on land is sold for the purpose of prompt severance either within a specified time, or within a reasonable time, as implied by law, the subject-matter of the contract is personalty, and not realty, and in such case a verbal contract for the sale thereof is not within the statute of frauds, and is enforceable. Montgomery Development Co. v. Miller-Vidor Lumber Co., 139 S. W. 1015; Davis v. Conn, 161 S. W. 39; Groce v. West Lumber Co., 165 S. W. 519; Ryan Lumber Co. v. Ball, 177 S. W. 226; Kreisle v. Wilson, 148 S. W. 1132; Houston Oil Co. v. Boykin, 153 S. W. 1176; Houston Oil Co. v. Hamilton, 153 S. W. 1194; Leonard v. Medford, 85 Md. 666, 37 Atl. 365, 37 L. R. A. 449. In the case last cited the court quotes with approval from 1 Greenleaf, § 55, as follows:

"In contracts for the sale of things annexed to and growing upon the freehold, if the vendee is to have a right to the soil for a time, for the purpose of a farther growth and profit of that which is the subject of sale, it is an interest in land, within the meaning of the fourth section of the statute of frauds, and must be proved by writing; but, where the thing is sold in prospect of separation from the soil immediately; or within a reasonable and convenient time, without any stipulation for the beneficial use of the soil, but with a mere license to enter and take it away, it is to be regarded as substantially a sale of goods only, and so not within that section of the statute, although an incidental benefit may be derived to the vendee from the circumstances that the thing may remain for a time upon the land."

We think there is in the record sufficient evidence to show that it was contemplated by both parties that, if the contract was finally consummated, the timber would be removed during the winter of 1913–14, or at least in a reasonable time after the consummation of the contract. On this point we find the following evidence:

In a letter of September 27, 1913, from the appellee to Dr. McDowell the appellee wrote as follows:

"We have numerous outfits working on the river, putting out these classes of timber, which we cut at our mill, together with pine, and will be glad to enter into agreement with you for the purchase of timbers of these kinds, starting from the lower edge of Polk county and north."

In letter dated October 20th from appellee to Dr. McDowell appellee wrote in part as follows:

"Wish to advise you our attitude in this matter. We have ten or twelve teams we would like to move up the river on ash and cottonwood before long."

Appellee further wrote in that letter:

"I should judge that in the entire Viesca bottom, together with the stuff in the bottoms on the Hirams, and possibly the Thomas (which I understand is all the timber that you own south of the Houston East & West Texas Railroad), that, taking this all together, we probably could get a winter's haul for eight or ten teams."

In letter dated November 3d from appellee to Dr. McDowell appellee wrote as follows:

"3. In case of a trade with you, we would like to close up as soon as possible, as we have some teams now we could put right in on this timber, and it is necessary that we log the ash in the winter time."

The witness McDowell testified:

"Mr. Robertson never gave me any reason for his apparent urgency in wishing to make a deal of any ash and cottonwood timber owned by the West Lumber Company in any conversation had with me, only he said that he would soon be done down where he was logging, and that he wanted some more timber."

There is other evidence tending to show that it was understood by both parties that the Export Company was expecting to procure the timber for removal during the winter of 1913 and 1914 for the purpose of manufacturing it into lumber. We overrule the tenth and eleventh assignments.

[7] By assignments 12 to 35, inclusive, appellant in various forms, in effect, insists that the trial court erred in permitting appellee to recover as damages the difference between the price to be paid for the timber and the value of the lumber which it could and would have manufactured out of such timber, less the costs and expenses of getting said timber to the mill of appellee, and the costs incident to its manufacture into lumber; it being contended that appellant had no notice of any fact before or at the time of the making of the contract of sale, or at any time prior to the breach thereof, which would put it upon notice that, unless it performed the contract, appellee would probably suffer the special damages claimed by it, and that in such case the measure of damages for the breach of the contract for the sale and delivery of the timber is the difference between the market value and the contract price of the timber at the time and place at which the same should have been delivered under the contract.

It is the well-settled rule that the damages ordinarily recoverable for a breach of a contract for the sale and delivery of a commodity, in the absence of notice that the thing sold was to be used for some special purpose, are the difference between the contract price and the market value of such commodity at the contractual point of delivery, but we have no such case for consideration. The case as made by the allegations and proof of appellee in the instant case is that in all of the dealings and transactions between the contracting parties it was understood that the timber sold by appellant to appellee was to be delivered to appellee upon the ground immediately upon the consummation of the contract, to be removed by appellee during the winter season of 1913–14. It was also understood by and known to appellant during the negotiations between the

parties, and before appellee's alleged damages accrued, that appellee intended to promptly sever such timber from the soil, and soon thereafter cut it into merchantable lumber at its sawmill at Wallisville. The jury found that the Export Company could and would have manufactured said timber into lumber at a profit of $4,636.99, the sum for which the court rendered judgment, and that in the light of information had by the Lumber Company it was chargeable with knowledge of the intention of the Export Company to use the timber in question in its mill at Wallisville for manufacturing purposes, and that the Lumber Company also had knowledge of such facts as would put it on notice that the Export Company would likely suffer damage because of not having such timber so as to manufacture it into lumber at its mill at Wallisville. The jury also found that during the milling season of 1913-14 there was no ash or cottonwood timber, other than that involved in this suit, and other than that which was purchased and used by the Export Company, which the Export Company could have purchased for profitable use at the Wallisville mill. The undisputed evidence shows that the Export Company did not have sufficient timber during the year 1914 to keep its mill running, and that it would have been able to and would have manufactured the timber · in question, in addition to that which it had purchased elsewhere than from appellant.

If appellant had such notice as found by the jury, the general rule above stated is not applicable to the facts of this case. If, by notice of the intended use of the timber by appellee, at the time of making the contract, or at any time before the breach thereof, appellant was put upon notice that appellee, by reason of such breach, would reasonably suffer the special damages claimed by it, appellant would be liable to appellee for such special damages as should have been reasonably anticipated would, and did in fact, flow directly from such breach.

It is a fundamental and cardinal principle of the law of damages that the injured party shall have compensation for the injury sustained. The injured party is entitled to recover full indemnity for his loss, and to be placed as nearly as may be in the condition which he would have occupied had he not suffered the injury complained of. No measure of damages which does not afford just compensation for the loss sustained can stand the fundamental test. Upon this principle the measure of damages in any case must be based, or it neither accords with principle nor authority. Kirby Lumber Co. v. Cummings & Co., 57 Tex. Civ. App. 291, 122 S. W. 273 (writ of error denied by Supreme Court); Poutra v. Sapp, 181 S. W. 792; Postal Tel. Co. v. Talerico, 136 S. W. 575; Carrico v. Stevenson, 135 S. W. 260; Kelley v. Carriage Co., 120 Wis. 84, 97 N. W. 674, 102

Am. St. Rep. 971; Blue Grass Cordage Co. v. Luthey, 98 Ky. 583, 33 S. W. 835; Jordan v. Patterson, 67 Conn. 473, 35 Atl. 521; Gaslight Co. v. Coal Tar Co., 65 Md. 73, 3 Atl. 108; Trigg v. Clay, 88 Va. 330, 13 S. E. 434, 29 Am. St. Rep. 723; Hammer v. Schoenfelder, 47 Wis. 455, 2 N. W. 1129.

We think the evidence warrants a finding that the Lumber Company, from the facts shown to have been known to it, should have reasonably anticipated that by a breach of its contract the identical damages claimed by the Export Company, and for which it recovered, would result. We do not think the court erred in submitting the question of special damages to the jury, nor in rendering judgment for the plaintiff for such damages as found by the jury. Assignments 12 to 35, inclusive, are therefore overruled.

[8] The thirty-sixth assignment insists that the court erred in permitting in evidence the Export Company's petition in intervention, filed by it in the suit of Pritchard v. West Lumber Company, on the 29th day of January, 1914, wherein the timber in question was involved, which said petition contained, among other things, the following:

"That this intervener, the Cummings Export Company, has a contract with the defendant, West Lumber Company, for the sale to intervener by the said West Lumber Company of timber located on certain tracts of land in Polk county, Tex., described as follows: [Then follows a description of the same tracts of land set forth in plaintiff's petition in the instant case.]"

This petition also repeated other allegations of the plaintiff's petition in this case.

The objection to the introduction of this petition was as follows: That the testimony was irrelevant, immaterial, and incompetent, and was highly prejudicial to the rights of the defendant; that it was not an act or declaration of the defendant by which it could be bound; was an ex parte statement prepared by the attorneys and verified by the representatives of the plaintiff; was a self-serving, verified affidavit, stating facts, conclusions, opinions, and hearsay, assumed the existence of a contract, and assumed the existence of the controverted facts of the entire case; was a matter of opinion, and stated legal conclusions based upon declarations of other persons; that, if any contract existed, it had been breached prior to the filing of the document, and notice at that time to the defendant came too late; that there was no proof of a contract, the evidence failing to establish any contractual relation; that, if any contract had existed, it was breached by demands made by the plaintiff and the imposing of conditions by the plaintiff which were admittedly not a part of the original agreement, the effect of which conditions and demands was to terminate the contract; further, that this testimony could not in any way be used as a predicate for the recovery of special damages, such damages not being recoverable, because no predi-

cate therefor existed in the contract; that, if offered for the purpose of aiding in the recovery of damages, then such damages were too remote and consequential. The testimony was further objected to as being post litem, being the declaration of plaintiff's cause of action made by its attorneys after a controversy had arisen.

The court in admitting the evidence instructed the jury as follows:

"In this connection the court instructs you that this evidence just admitted cannot be considered by you in any way as being evidence of any past facts that it may seem to recite to you; that is, when it recites certain things as having transpired, that is not evidence of those facts at all. It is only admitted and can only be considered by you upon this question alone; as to the attitude and position which was assumed and taken by the plaintiff at the time that intervention was filed in reference to this matter, and the claims that were then made as to the present conditions at that time, and future claims that were made and asserted. In that connection also that suit has nothing to do with this case, and you gentlemen do not know how it came out, and have no concern as to how it came out."

We think the evidence, as limited by the court, was admissible as tending to prove that plaintiff at that time was still insisting upon appellant's complying with its contract, and as tending to prove that appellant at that time had notice that such insistence was being made, and that such notice was given in sufficient time to enable appellant to carry out its contract and prevent the damages claimed by appellee, and we therefore overrule the thirty-sixth assignment.

[9] We overrule the thirty-eighth and thirty-ninth assignments complaining of the letters written by the appellee to appellant on the 2d day of January and 12th day of February, 1914, respectively, by means of which appellee was insisting that appellant had agreed to deliver to it the timber in question and that it should perform its contract, because these letters were admissible for the same purpose as was the petition in intervention before referred to. Both of these letters gave notice to appellant that by a delay in carrying out its contract the damages to appellee were being incurred. Evidence tending to prove notice, though subsequent to the making of the contract, was admissible, if it be shown that damages thereafter accrued by reason of the continued refusal on the part of appellant to carry out its contract. Bourland v. Railway Co., 99 Tex. 407, 90 S. W. 483, 3 L. R. A. (N. S.) 1111, 122 Am. St. Rep. 647; Naylor v. Parker, 139 S. W. 93; Baker & L. Mfg. Co. v. Clayton, 46 Tex. Civ. App. 384, 103 S. W. 197; Wells Fargo v. Battle, 5 Tex. Civ. App. 532, 24 S. W. 353.

[10] In the case first cited it is held that, when one who contracts to deliver a thing negligently fails to make the delivery after receiving notice that damages would result by a delay in making such delivery, he is liable for such damages as accrue after the time, subsequent to the receipt of such notice, when he could have made the delivery, although he had no notice that such damages would accrue by reason of delay at the inception of the contract for delivery.

[11] By the fortieth, forty-first, forty-second, and forty-third assignments appellant insists that the trial court erred in submitting to the jury the question whether or not during the milling season of 1913–14 there was ash and cottonwood timber other than that involved in this suit and other than that actually used by plaintiff, which the plaintiff could have purchased for profitable use of the Wallisville mill:

(1) "Because the question of whether or not any other timber could have been purchased for profitable use is no issue in this case, the undisputed evidence showing that the parties were dealing merely with the sale of timber, and there was never at any time any negotiations concerning the purposes for which the timber was to be used or the necessity for immediate delivery."

(2) "Because profitable use would include too many uncertain elements, including such as the expense of mill, strikes, riots, storms, acts of God, etc."

(3) "Because there is no certain and definite way from which the jury could determine what would be a profitable use."

(4) "Because the issue limits to timber which the plaintiff could have purchased for 'profitable' use of the Wallisville mill, whereas the rule of law is that the plaintiff should have purchased, at whatever price it could, similar timber, and then to have looked to the defendant for the difference between the contract price and the price the plaintiff had to pay."

We have already answered the first objection to said charge by what has been said under assignments 12 to 36, and will not repeat the same here. We overrule the second and third objections as being purely technical and without merit. We overrule the fourth and last objection as being without merit. It is inconceivable how appellant could have been in any way relieved by the purchase of other timber by appellee which it could not use at a profit; the undisputed evidence showing that, if the timber purchased by appellee from appellant had been delivered, it could and would have been manufactured at a profit.

[12] By the forty-fourth assignment it is, in effect, insisted that, in estimating the damages suffered by appellee, the timber actually used by appellee, after making the contract in question, should have been considered in determining whether there was timber available which appellee could have used to minimize its damages. We think it can hardly be seriously contended that the timber shown to have been used by appellee in operating its mill during the year 1913–14 should be taken into consideration in an attempt to minimize the damages caused by the failure of appellant to deliver the timber purchased from it, as the undisputed evidence shows that, in addition to all the timber that was actually used, the capacity of the mill would have been sufficient to have handled the tim-

ber contracted for, and that it would have been so used had the contract been performed. The assignment is overruled.

What has already been said disposes of assignments 45 to 54, inclusive, and we will therefore not further discuss the propositions presented thereunder, further than to say that we think the court did not err in refusing the special charges requested as the charge given sufficiently submitted the material issues raised by the pleadings and evidence.

[13] By the fifty-fifth and fifty-sixth assignments it is insisted that the trial court erred in permitting C. J. Robertson to testify: (1) That there was no other timber available to the Export Company, for the purpose of manufacturing into lumber, of the kind and character which the timber purchased from appellant would have made; and (2) that he knew of no effort on his part which he had left undone to supply the mill of appellee with the proper material for its purposes, because the same were but statements of conclusions of the witness, and not statements of facts, and therefore not admissible as evidence.

The witness testified that he was familiar with the timber condition along the river, such as would be accessible to the mill at Wallisville; that he based this statement upon the time and experience he had had in that territory, and the work that he had been doing constantly; that he knew there was no timber in that vicinity available to the Export Company that would take the place of that contracted for from appellant; that he knew there was not because he had been all over the land adjacent to Wallisville mills; that there was no railroad to the mills; and that such timber as they got had to be floated down the river. He testified in detail as to his efforts to find timber for the mill, and as a final statement stated that he had used every effort to find timber to supply the needs of the mill and had failed. We think the evidence complained of was admissible, and that the trial court did not err in admitting it.

In the case of Houston & Texas Central Ry. Co. v. Ellis, 134 S. W. 248, in which a writ of error was denied by the Supreme Court, it is said:

"It might be impossible to put the jury entirely in possession of the general appearance of things on the ground and all of the probably minute circumstances from which a witness would conclude that the fire burned with the wind, and in such case we are inclined to think it would not be improper to allow the jury to have the benefit of the conclusion arrived at by the witness. If such conclusions were the result of insufficient data to support them, or otherwise weak or unreliable, that might be shown by cross-examination, whereby the witness might be required to state fully the grounds of his conclusions. A very learned and scientific discussion of the admissibility of the conclusions of witnesses, or, as it is called, 'opinion evidence,' is found in Prof. Wigmore's great work on Evidence, 3 Wigmore, Evidence, § 1919, bottom of page 2552 et seq. From section 1929 we quote: 'But if we are dealing with the other

sort of witness—the one not claiming greater skill, but simply drawing inferences from his own observations which any one in his place could draw—the answer may be different. The answer here virtually depends on our attitude, whether of favor or disfavor, towards the principle involved. If we believe that the drawing of inferences by an observer of the data is a hateful, dangerous, and reprehensible thing, if we prefer to put obstacles of technical and not real force in the way of the most common sort of testimony, if we believe that this modern and minor rule about opinion is a fundamental canon in the investigation of truth, if we are opposed to Baron Parke's wish to employ "a compendious mode of ascertaining the result of the actual observation of the witness," then, of course, we shall look upon every witness as a possible "usurper" of the jury's functions. We shall watch each phase of his testimony anxiously, and stop his mouth as soon as he approaches the insidious heresy of an "opinion" or inference. On the other hand, if we believe that the rule in question, as applied to the unskilled witness who has personally observed the data, is a mere minor rule of convenience not in any way concerned with the value of the testimony, if we hold that it is inconsistent to aim in theory at convenience and simplicity by a rule which in thorough application causes ten times the inconvenience and complication which in theory it was to avoid, if we prefer to make the rules of evidence our tools rather than to become ourselves their helpless slaves, then we shall conclude to adopt the first form of the test as above; that is, that we shall allow the witness to state freely all the results which he is qualified to reach, and only now and then, when he comes to matters as to which it is instantly clear that the jurors are or can be as fully equipped with the data, we shall exclude his inferences.' "

See, also, Belding v. Archer, 131 N. C. 287, 42 S. E. 800–811.

We have carefully considered all of appellant's assignments, and have found no such error committed by the trial court in the trial of this case as should cause a reversal of the judgment there rendered. Therefore the judgment of the trial court is affirmed.

Affirmed.

## On Motion for Rehearing.

Since filing our original opinion appellant has filed its motion for rehearing, and therein asks that we specifically pass upon its assignments 37 and 50. It is requested: First, that it be shown in our opinion that appellant did not acquiesce in the trial court's qualification of the evidence complained of in the thirty-sixth assignment of error (such qualification being fully set out in the original opinion under a discussion of the thirty-sixth assignment). It is urged that it is not shown in the original opinion that appellant objected to such qualification.

By the thirty-seventh assignment it is shown that appellant did urge that the court erred in instructing the jury, upon the evidence complained of by the thirty-sixth assignment, as follows:

"In this connection the courts instructs you that this evidence just admitted cannot be considered by you in any way as being evidence of any past facts that it may seem to recite to you; that is, when it recites certain things as having transpired, that is not evidence of those facts at all. It is only admitted and can only

be considered by you upon this question alone: as to the attitude and position which was assumed and taken by the plaintiff at the time that intervention was filed in reference to this matter, and the claims that were then made as to the present conditions at that time, and future claims that were made and asserted. In that connection also that suit has nothing to do with this case, and you gentlemen do not know how it came out, and have no concern as to how it came out."

[14] The contention of appellant is that such instruction was upon the weight of the evidence and invaded the province of the jury as to what force and effect should be given to the testimony, and advised them that the jury might consider it for purposes as to which it was not competent proof.

We held in our original opinion that the plea of intervention, introduced as evidence, as qualified by the court, was admissible for the purposes for which it was admitted, and we are unable to see how the instruction of the court to the jury not to consider the allegations in the plea of intervention introduced, as a statement of any fact, was a charge upon the weight of the evidence, or that it could have injured the rights of appellant. We therefore overrule the thirty-seventh assignment.

By the fiftieth assignment it is urged that the findings of the jury as to the amount of the profits which appellee would have made from the timber contracted for, had it been delivered was unsupported by the evidence, and contrary to the evidence.

The contention of appellant is that the testimony of the witness C. J. Robertson, the only witness who testified as to profits, shows that all the costs incident to the manufacturing of the ash timber into lumber was $17.40 per 1,000 feet, and that the same testimony shows that the value of the manufactured ash lumber was $26 per 1,000 feet, and therefore the profits was the sum of $8.60 per 1,000 feet instead of $9.25, as found by the jury; that it is shown by the testimony of the same witness that all the cost incident to the manufacturing of the cottonwood timber into lumber was $12.90 per 1,000 feet, and that the difference in the cost of manufacture and of the value of the cottonwood lumber was $4 per 1,000 feet instead of $4.65, as found by the jury. We think counsel for appellant in preparing his brief has misconstrued the testimony of the witness Robertson, as it appears on pages 61 and 62 of the statement of facts. It is shown that Robertson testified that the costs incident to manufacturing the ash and getting it to the Galveston market was $17.40 per 1,000 feet, and that the costs incident to manufacturing the cottonwood and getting it to Galveston market was $12.15 per 1,000 feet, while it is shown by the testimony of the same witness that the market value of the ash lumber at Galveston was from $7 to $65 per 1,000 feet, according to quality, but that the average value was from $26 to $30 per 1,000 feet, and not $26, as stated by counsel. The same witness also testified that the market value of the cottonwood lumber at Galveston was from $16, $17, to $19 per 1,000 feet, and not $16 to $17, as stated by counsel in his brief. We think the findings of the jury as to the value of profits, etc., is supported by the evidence; hence we overrule the fiftieth assignment. Appellant has also requested in its motion that we include in our opinion a comprehensive statement of the testimony of appellant's witness H. O. Compton. We fail to see that such statement could in any manner benefit appellant. The only effect such testimony has is to show a conflict in the evidence, and as we think the testimony of Robertson, which is controverted by the testimony of Compton, was sufficient to warrant the jury's findings, we can see no reason for making a statement of Compton's testimony as requested. We see no reason for receding from the holding expressed in the original opinion; therefore the motion is overruled.

Overruled.