

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Bascom Giles
Commissioner, General Land Office
Austin, Texas

Dear Sir:

> Opinion No. O-1860
> Re: Whether School Land Board or
> Land Commissioner has the au-
> thority and control over the
> sale of the timber on public
> lands and the leasing of pub-
> lic lands for grazing.

In your letter of January 15, 1940, you asked
the opinion of this department in answer to two questions,
which we will state briefly as follows:

1. Whether the sale of the timber on un-
sold surveyed public school land, where such
land may properly be given a timber classifica-
tion, may be made by the Land Commissioner under
the procedure set out in Articles 5321 and 5322,
V.R.C.S., 1925, or whether the sale of such tim-
ber must be made by the School Land Board, un-
der the applicable provision of House Bill 9,
Acts of the 46th Legislature (1939), c.3, p.465?

2. Whether application for grazing leases
on unsold surveyed school land may be considered
and the lease made by the Land Commissioner,
under the procedure set out in Article 5331, et
seq. Sec. 3, Chap. 3, Title 86, V.R.C.S. 1925,
or whether such leases must be made by the School
Land Board under the applicable provisions of
House Bill 9, Acts of the 46th Legislature (1939)
c.3, p. 465?

The latest enactment, generally known as H. B. 9, in its Sections 1 and 2, purports to be a comprehensive bill, amending Sections 6 and 8, House Bill 358, Acts of the 42nd Legislature (1931), c. 271, p. 452, generally known as the 1931 Act; and providing a complete procedure for the sale of both surveyed and unsurveyed public school lands, and for the leasing of the unsurveyed lands for all minerals, but reserving from the Act the leasing of "gold, silver, platinum, cinnabar, and other metals" on surveyed lands. The leasing of such lands for the production of the excepted minerals, by its terms, is to be governed by the 1931 Act. House Bill 9 makes no specific reference to the sale of timber on such lands, nor to the leasing of such lands exeept for the production of minerals, and the minerals intended to be covered are oil, gas and sulphur. The words lease and leasing are used throughout House Bill 9, sometimes accompanied by words making it clear just what types of leases are meant and sometimes not.

In addition to amending the 1931 Act, House Bill 9 in its Section 5 ereates a School Land Board defines its powers and prescribes its duties, provides regulation for the sale and leasing of all lands set apart for the Permanent School Fund and the several asylum funds, excepts from its terms certain lands, abolishes the Board of Mineral Development and invests the School Land Board with its powers and duties. If House Bill 9 covers and controls the sales of timber and leases for grazing inquired about by you, then it is by reason of Section 5, which we quote in part:

> "1. All lands set apart for the permanent free school fund and the several asylum funds by the Constitution and the laws of this State and the mineral estate in river beds and channels, and the mineral estate in all areas within tidewater limits, including islands, lakes, bays and the bed of the sea, belonging to the State of Texas, are subject to control and disposition in accordance with the provisions of this Section and other pertinent provisions of this Act and other laws not in conflict herewith; . . .
> ". . .
> ". . .

> "4. The duties of the School Land Board shall be to set all dates for the leasing and sale of surveyed lands, and to determine the prices at which any land, whether surveyed or unsurveyed, shall be leased or sold, and to perform any other duties that may be imposed upon them by law. . ."
(Underscoring ours)

Honorable Bascom Giles, Page 3

The articles referred to in your first question, Nos. 5321 and 5322, V.R.C.S. (1925) apply only to the sale of the timber from timber lands and have not been expressly amended or repealed. Unless House Bill 9 repeals them by implication, they will control such sales. We quote their pertinent provisions:

"Art. 5321. Timber Lands. Timber on lands shall be sold in full tracts for cash at its fair market value and the commissioner shall adopt such regulations for the sale thereof as may be deemed necessary and judicious, subject to the provisions of this chapter. By timbered lands is meant lands valued chiefly for the timber thereon. (Acts 1901, p. 296, Acts 1919, p. 312)

"Art. 5322. Timber: Sale. Application to purchase timber shall be made in the manner provided for the filing of applications for the purchase of land . . . If two or more applications for timber alone be filed on the same day, the one offering the most therefor shall be accepted. The purchaser of timber without the land shall have the right of ingress and egress upon the land for a period of five years after date of award to remove or protect all the timber thereon. After that time the title to the timber shall revert to the fund to which the land belonged and be again subject to sale by the State, unless the land shall sooner be sold and fully paid for and patent issued thereon, and in that event the timber shall revert to the owner of the land. (Acts 1907, p. 490; Acts 1919, p. 312)."

There is an ambiguity created, in that House Bill 9 purports to be a comprehensive act covering the sale of lands and making the authority of School Land Board over such sales exclusive, but it does not expressly amend or repeal the articles particularly referring to sales of timber. It then becomes necessary for us to construe House Bill 9, to determine the legislature's intent, for its intent is always controlling. If Articles 5321 and 5322 are repealed by House Bill 9, it must be by implication, and such repeals are not favored. To have a repeal by implication, the provisions must be so repugnant as not to permit of any other construction; otherwise, they must both be allowed to stand, in pari materia.

To the extent that the School Land Board, a

Honorable Bascom Giles, Page 4

statutory board, is given authority by House Bill 9, that same authority is taken from the Land Commissioner, a constitutional officer. Therefore, the Act should be strictly construed, in favor of the general power and against the exception. Article 5307, V.R.6.S.(1925).

To determine the legislature's intent, the rules of statutory construction provide many aids, but we must look first to the intent as expressed in the language of House Bill 9, itself. The only sales referred to in House Bill 9 are sales of land. If a sale made under Article 5322 were not a "sale of land", then House Bill 9 would not apply.

An instrument conveying timber, the terms of which comply with Article 5322, is not construed by our Texas courts to convey an interest in land, nor is it a "sale of land". Although we find no case construing a sale under Article 5322, there are many cases construing instruments containing like provisions. The reasons are that such a sale constructively severs the trees from the land, contains no warranties, provides a time limit within which the timber must be removed and a reversion clause. There is a rather fine, but nevertheless clear distinction here, which is ably discussed in the leading case of Davis v. Conn. (Tex. C.C.A.) 161 S. W. 39, 41 (Writ of Error dismissed for want of jurisdiction). Another reason is that parol sales under such terms have been held by the courts not to be within the statute of frauds. West Lumber Co. v. C. R. Cummings Export Co., 196 S. W. 546, 551. Further, a mortgage of the trees by the purchaser would be a chattel mortgage. Boykin et al v. Rosenfield & Co. 69 Tex. 115, 118.

The answer to your second question is not as free from doubt. House Bill 9 does not refer to the leasing of grazing lands specifically. Neither do the Articles which confer on the Land Commissioner the general power to lease lands. Article 5307 and Article 5331 to 5337, incl., supra.

You state that it has been the practice of the Land Commissioner to issue grazing leases in the manner deemed best by him. His acts in this respect were, of course,

Honorable Bascom Giles, Page 5

under the authority given him in Articles 5307 and 5331-5337, or at least, as so construed by him.

Subsection 1 of Section 5, House Bill 9, supra, provides that the lands included are "subject to control and disposition in accordance with the provisions of this Act and other laws not in conflict", there indicating the intent of the legislature to leave the old laws in effect. We construe these words as indicating that the School Land Board's authority over the leasing of lands should be limited to such leases as were covered by the Act. Also, where it used the words "all dates" and "any lands", we think it intended that they refer only to the dates for leasing of the lands and to the type of leases contemplated in the Act.

Under the above construction, we have yet to determine whether House Bill 9, wherein the words lease and leasing are used very loosely, includes a grazing lease and leasing for grazing. To do this, the applicable rules of construction require that we look to the entire Act, not to particular words, subsections or sections. We may look also to the circumstances surrounding the passage of the Act.

It is well known that House Bill 9 was passed as a result of dissatisfaction over the way the leasing and sale of State lands were being handled. This is confirmed by the emergency clause, Section 8 of the Act. The leases over which the dissatisfaction arose were oil and gas leases.

In Section 1, subsection (b), and Section 2 are to be found the language, which, in our opinion, makes it clear just what types of leases are intended to be covered by the Act:

"Sec. 1 (b) . . . lands within such five-mile distance shall be subject to lease only and all of such leases shall reserve to the State at least a one-eighth free royalty on oil, gas, sulphur, and other minerals . . .

"Sec. 2 . . . all unsold public free school land,

Honorable Bascom Giles, Page 6

> both surveyed and unsurveyed, shall be subject
> to lease by the Commissioner to any person, firm,
> or corporation for the production of minerals,
> except gold, silver, platinum, cinnabar, and
> other metals, that may be therein or thereunder,
> in accordance with the provisions of Chapter 271,
> Acts of the Forty-second Legislature, as amended
> and Subdivision 2, Chapter 4, Title 86, Revised
> Civil Statutes of Texas of 1925, relating to leas-
> ing public areas, in so far as same is not in
> conflict herewith...."

Section 2 also preserves all rights under the Relinquishment
Act.

In numerous places in the Act, the terms mineral
lease and oil and gas lease are used. After reading the
whole Act, it seems to us very clear that the Legislature
intended that it apply only to mineral leases and the pro-
cedure outlined applies to all minerals except those spe-
cifically excepted from its provisions by Section 1 (b)
supra.

Having reached this conclusion, it does not seem
reasonable that the legislature could have intended that the
words "to determine prices at which any land, whether sur-
veyed or unsurveyed, shall be leased or sold" used in
Section 5(4) in defining the duties of the School Land Board
be interpreted to include grazing leases. It does not com-
port with reason to say that the legislature intended that
those words include grazing leases, when clearly no other
part of the Act refers to them. The reasonable interpre-
tation of these words is to limit them to the land and to
leases of the type covered generally by the Act, namely, to
mineral leases.

Therefore, it is the opinion of this department,
and you are so advised, that the Land Commissioner, and not
the School Land Board, has full authority and control over
the leasing of unsold, surveyed public school lands for
grazing and the sale of timber from such lands and the pro-
cedure for both is contained in Title 86, Chapter 3, V.R.C.S.
(1925) and particularly Articles 5307, 5321, 5322, 5331-5337,
incl.  It follows that House Bill 9, 46th Legislature (1939)

Honorable Bascom Giles, Page 7

does not apply to either.

Trusting that this satisfactorily answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By *James Noel*

James Noel
Assistant

JN:BT

APPROVED FEB 16, 1940

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN