(Decided 10th March, 1886.)

---

THE EQUITABLE GAS LIGHT COMPANY OF BALTIMORE CITY *vs.* THE BALTIMORE COAL TAR AND MANUFACTURING COMPANY.

*Breach of Contract of Sale of Personal property—Assessment of Damages—Market price.*

The rule for the assessment of damages for the breach of a contract for the sale of personal property, is the difference between the market price of the article, if there is a market price, where it is to be delivered, and the contract price.

If there is no such market price at the place of delivery, and the goods are costly and difficult of transportation from a distance, and are intended to be used for manufacturing purposes, then the market price may be arrived at by deducting the cost of manufacturing and the price of the raw material from the market price of the manufactured article.

APPEAL from the Circuit Court of Baltimore City.

This appeal was taken by the defendant in the case, from the following decree:

"It is thereupon this 30th day of June, 1885, by the Circuit Court of Baltimore City, adjudged, ordered and decreed, that the plaintiff is entitled to relief in the premises, and to specific performance of the agreement entered into between the plaintiff, and James D. Smallwood and Henry Y. Attrill, representing the defendant, as set forth in the bill of complaint; and that by force of said agreement, the said plaintiff is entitled to take from the gasworks of the defendant, in the City of Baltimore, all the coal tar there made by said defendant since the first day of July, 1884, and all coal tar which said defendant shall hereafter make there, prior and up to the fourteenth day of February, 1887, upon the terms set forth in said memorandum.

" And it is further adjudged, ordered and decreed, that the defendant produce in Court, duly executed by the proper officers thereof, the duplicate copies of said agreement, heretofore executed by the president of the plaintiff, and by him left with the said Smallwood and Attrill, to be executed by the proper officers of the defendant; or if the said defendant shall fail to produce said duplicates, or one of them so executed, and to deliver one of them to the plaintiff within five days from the date of this decree, that then the said defendant, upon the said plaintiff tendering to it a new draft, duly executed by the plaintiff in duplicate, of the said agreement, as the terms thereof appear from the said original memorandum, shall forthwith cause one copy thereof to be executed by the proper officers of the defendant, and forthwith deliver the same to the said plaintiff or its solicitor.

" And it is further adjudged, ordered and decreed, that the preliminary injunction heretofore granted by this Court, prohibiting the defendant, its officers, servants, agents and workmen from supplying or delivering to any person or persons, corporation or corporations, other than the plaintiff, or its agents, all or any part of the coal tar made or

produced, or to be made or produced at the gasworks of the defendant, in the City of Baltimore, be, and the same is hereby, continued in force until the fourteenth day of February, 1887.

"And it is further adjudged, ordered and decreed, that the plaintiff is entitled to compensation from the defendant, for the losses suffered by the plaintiff by reason of the non-delivery of the coal tar made by the defendant, at its gasworks in Baltimore, since the first day of July, 1884, which the said defendant has already disposed of to any person or persons other than the said plaintiff; the amount of such compensation to be the difference between the market value of said coal tar at the City of Baltimore, at the time it was deliverable under the contract above mentioned, and the price thereby agreed to be paid for the same by the plaintiff; and that it be referred to the auditor to state an account of the amount of such compensation to which the plaintiff is so entitled, from the evidence already in the cause, and such further evidence as may be produced before him by either party; and there being evidence in the cause to the effect that no coal tar has been in the market, at the City of Baltimore, in its crude state, since the first day of July, the auditor is at liberty to estimate the market value of coal tar in said city at any time since the 1st of July, 1884, for the purposes of this cause, by deducting from the sum of the market prices of all the products obtained by the plaintiff from the coal tar manufactured by it, all the costs and expenses incident to such manufacture, and taking the difference as the market value of the raw material so manufactured by the plaintiff."

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, RITCHIE, and BRYAN, J.

*Thomas W. Hall,* and *Charles Marshall,* for the appellant.

The appellee claims compensation for the non-delivery of the coal tar made at the appellant's works, after the 1st of July, 1884, the date of the alleged breach of the appellant's contract with the appellee.

For the purpose of arriving at the amount of that compensation, the decree provides that "there being evidence in the cause to the effect that no coal tar has been in the market, at the City of Baltimore, in its crude state, since the first of July, 1884, the auditor is at liberty to estimate the market value of coal tar in said city, at any time since July 1st, 1884, for the purposes of this cause, by deducting from the sum of the market prices of all the products obtained by the plaintiff from the coal tar manufactured by it, all the costs and expenses incident to such manufacture, and taking the difference as the market value of the raw material manufactured by the plaintiff."

Such a rule for ascertaining the measure of damages is without precedent or support in principle or authority.

It is not supported by the authorities cited by the appellee in support of its view of the rule for estimating the damages. Neither the facts in the case in 55 *Md.*, 51, nor the rule for ascertaining damages sanctioned in that case, present the slightest analogy. The case of *France vs. Guadet, L. R.,* 6 *Q. B.,* 199, was an action of trover for the wrongful conversion of goods purchased by the plaintiff, and in the absence of other proof of value, and as against a *tort-feasor,* the Court accepted, as the measure of value, the price at which the goods had been re-sold to a *bona fide* purchaser.

The vice of the rule adopted in the present decree is that it includes, as part of the value of the raw material of manufacture, all the profits which the appellee claims that he might have made upon his sub-contracts for the various manufactured products obtained by him from the

coal tar. This is contrary to well established principles recognized by this Court. *Abbott vs. Gatch*, 13 *Md.*, 332–334, &c.

"In awarding damages for the non-performance of an existing contract, the gains or profits of collateral enterprises in which the party claiming them has been induced to engage by relying upon the performance of such contract, *will not be included.*" 1 *Sutherland on Damages, page.* 77. See also *Hadley vs. Baxendale*, 9 *Exch.*, 341–354; 1 *Sedgwick on Damages*, 76, 223–237, *note on Hadley vs. Baxendale; Benjamin on Sales*, (4th Am. Ed.,) secs. 870, 871, &c., and 882 a.

If it be true that coal tar had no market value in the City of Baltimore, after the 1st of July, 1884, (at the time and place of delivery,) the "true rule" for ascertaining the measure of damages, is thus stated, in a similar case, by the Supreme Court of the United States: "The true rule would seem to be to allow the plaintiff to show the price they would have had to pay for coal in the quantities in which they were entitled to receive it under the contract, at the nearest available market where it could have been obtained. The difference between such price and the price stipulated for by their contract, with the addition of the increased expense of transportation and hauling, (if any,) would be the true measure of damages." *Grand Tower Co. vs. Phillips*, 23 *Wall.*, 479, 480. See also *Dana vs. Fielder*, 12 *N. Y.*, 40; *Bourne vs. Ashley*, 1 *Lowell*, 27; *Benjamin on Sales*, (4th Am. Ed.,) sec. 870, *page* 1010, *note.*

It is admitted that Philadelphia was the nearest market where coal tar could be obtained, and if there was any difficulty in obtaining it there, it was occasioned solely by the nefarious combination to check production and control prices, to which the appellee was a party.

The decree in this case is open to the still further objection that it allows the appellee as part of the measure

of damages, not merely his profits upon his sub-contracts for the sale of the manufactured products of the coal tar, but profits artificially and unlawfully inflated by means of a conspiracy among coal tar distillers for the purpose. See *Kountz vs. Kirkpatrick*, 72 *Penna. St.*, 376, and cases cited in opinion of Judge Agnew; *Benjamin on Sales*, (*4th Am. Ed.*,) page 1009, *sec.* 870, *note a.*

*William Reynolds*, for the appellee.

The defendant corporation having permitted Mr. Smallwood to hold himself out to the public as its vice-president, and acting president, from 13th of June, 1881, to 12th of July, 1882, without any interference on its part, is estopped to deny his authority to bind it by the acts done by him as such, to the same extent as if his authority had been conferred by the board of directors instead of by Commodore Garrison, who, according to the testimony of Mr. Baby, owned three-fourths of the stock, and was practically the gas company, for many purposes. See *Grape, Sugar and Vinegar Manf. Co. vs. Small*, 40 *Md.*, 395–400; *Burgess vs. Pue*, 2 *Gill*, 254–285; *Union Bank vs. Ridgely*, 1 *H. & G.*, 426; *Elysville Manf. Co. vs. Okisko Co.*, 1 *Md. Ch. Dec.*, 398; *Bk. U. S. vs. Dandridge*, 12 *Wheat.*, 64, 70; *Eckenrode vs. Chemical Co. of Canton*, 55 *Md.*, 51–65.

The plaintiff had a perfect right to destroy or to convert into fuel pitch, the whole or any portion of the coal tar that it had bought and paid for, and if the effect of its having so converted a portion of what it had on hand, before the defendant's failure to deliver what it had contracted to deliver, had been to raise the market price of coal tar, this could in no way lessen the defendant's obligation to carry out its contract nor alter the rule for estimating the damages for which it would be liable should it fail to do so.

Conceding for the sake of the argument that the agreement entered into by the members of the National Coal Tar Distillers' Association would not have been enforced by the Court as being contrary to public policy, the fact of the plaintiff having converted some of its coal tar into fuel pitch, in pursuance of such agreement and with the avowed object of keeping up the prices of the products manufactured from it, could have no possible bearing or effect upon the contractual rights and obligations subsisting between it and the defendant. *Kimball vs. Harman,* 34 *Md.,* 407, 411.

It is a principle well established by authority, both in this State and elsewhere, that where a Court of equity has once acquired jurisdiction of the subject-matter of a controversy, it may maintain that jurisdiction for the protection and final adjudication of all the rights and interests involved. *Kimball vs. Fitzhugh,* 22 *Md.,* 576 ; *Foley vs. Crow,* 37 *Md.,* 51; 1 *Pomeroy Eq. Jurisp., page* 168, *sec.* 181, *page* 245, *sec.* 237, *and note* 3 ; *Johnson vs. Cooper,* 2 *Yerg.,* 524 ; *Clarke vs. White,* 12 *Pet.,* 187 ; *Pacific R. R. vs. Atlantic & P. R. R. Co.,* 20 *Fed. Rep.,* 277–286 ; *Hayden vs. Snow,* 14 *Fed. Rep.,* 70, 74 ; *Bendell vs. Comstock,* 15 *Fed. Rep.,* 395 ; 51 *Am. Decis.,* 589, *note.*

The plaintiff is decreed compensation for its losses sustained by reason of the non-delivery to it, of the coal tar made by the defendant at its gasworks in Baltimore, since July 1, 1884, which it has already disposed of to any persons other than the defendant, and the rule of damages laid down, is the same as would have been proper in an action at law, either for breach of the contract or upon the first appeal bond which suspended the operation of the preliminary injunction, viz., the difference between the market value of said coal tar at the City of Baltimore at the time it was deliverable under the contract enforced by the decree, and the price agreed to be paid for it by the plaintiff thereunder ; and as there was evidence to the

effect that there was no coal tar in the market for sale in its crude state, in the City of Baltimore, at any time, since the 1st of July, 1884, the auditor was properly authorized to estimate its market value, by deducting from the sum of the market prices of all the products of the coal tar manufactured by the plaintiff, all the costs and expenses incident to such manufacture, and taking the difference as the market value of the coal tar in its crude state. See *Wood's Mayne on Damages, sec.* 22; *France vs. Gaudet, L. R.,* 6 *Q. B.,* 199; *Eckenrode vs. Chemical Co. of Canton,* 55 *Md.,* 51, 61.

STONE, J., delivered the opinion of the Court.

This is the second time that this case has been before this Court. The law was definitely settled on the former appeal, (63 *Md.,* 285,) that if the allegations of the bill were sustained by the proof, the complainant was entitled to relief. The proof has been taken, and the question now before us is principally the question of fact, whether the allegations of the bill are sustained by the proof.

It is entirely unnecessary to refer to these allegations, as they are fully set out in the opinion in the former case, nor can we incorporate, in this opinion, at any length, the voluminous testimony in the record. It will be sufficient to state our conclusions, with such brief references to the evidence as we think important.

It is established, by a clear *preponderance* of evidence, that the agreement, set out in the original bill, and marked exhibit B, was made between Smith, acting for the appellee, and Smallwood, claiming to act for the appellant, and approved by Attrill. It is also sufficiently proved that a memorandum in writing, containing the terms of the agreement was made both by Smith and Smallwood, at that time, but that the memorandum so made by Smallwood, was lost or destroyed.

It is also proved, that at the time the agreement was made, and the terms reduced to writing, that it was understood and agreed between Smallwood and Smith that a formal contract in writing, should be prepared and signed by the parties. This contract was prepared, and delivered to Smallwood, acting for the appellant, by Smith, about April, 1882. The contract was written in duplicate, and both signed by Smith, and one left at the office of the appellant, with a promise, on the part of both Smallwood and Attrill to have it signed, and returned in a few days. This was in April, 1882. Smith repeatedly called at the office of the appellant, but did not succeed in getting the contract. That in November, 1882, Mr. Attrill, who was then the president of the company, sent for Smith, and insisted that he should pay more than he was then paying for the tar, and denied the existence of the contract. The appellee continued to take the tar until July, 1884, when the appellant refused to deliver any more.

But the appellant insists that neither Smallwood nor Attrill had any authority to make a contract to bind the appellant company, and a good deal of its evidence is directed to that purpose. A very brief review of the facts, will show this position to be untenable.

The contract was made, by and between Smith, the president of the appellee company on the one part, and Smallwood, claiming to be the vice-president of the appellant company, and Attrill on the other part; and the appellant first denies that Smallwood was vice-president; and it appears from the charter, that no such officer as vice-president is provided for, and the *records* of the company do not show that any such was elected. As a general rule, it is true, that an agent of a corporation authorized to make a contract, must be appointed by the body of the corporators, or vote of the directors. But this Court has said in *Eckenrode vs. The Chemical Co. of Canton*, 55 *Md.*, 51. "That not only the *appointment*, but the

authority of the agent of a corporation may be implied from the adoption, or recognition of his acts, by the corporation or its directors."

The appellant company's stock was principally owned by residents of New York. The money to build it came from there. A single individual, C. K. Garrison, owned three-fourths of the stock, and in fact controlled all its operations. At the time this contract was made the company had no executive officers in Baltimore, except Smallwood, and Attrill, the contractor. They had commenced to make gas. They had contracted with the consumers through these agents. They had disbursed very large sums of money through the hands of Smallwood as vice-president. His name was on the door of the office, as vice-president. He had through the leading papers of Baltimore advertised the time when the company could supply the consumers with gas, and in such advertisements styled himself as vice-president. He himself swears he was appointed the vice-president in 1881, and resigned in April, 1882. But more important than all this, is the fact, that after he resigned and all his connection with the company ceased, the company for nearly two years afterwards continued to avail themselves of the contract that he had made. Upon such a statement of facts, the company are now clearly estopped from denying his authority.

But Smallwood was not the only one acting for the appellant in this contract. Both Smith and Smallwood explicitly prove that Attrill was consulted, and approved the contract. Attrill was the contractor for building the works. But by resolution of the board he was appointed "agent of the company for the time being, to make such arrangement as he may consider to the interest of the company, for, &c.;" while these resolutions go on and say what particular matters the company wished him then to attend to, they expressly treat him *as an agent*, and he so regarded himself when he says in his testimony in answer

to the question: "What did you do in pursuance of said authority?"

"I did anything that might be required of me for the benefit of the company, from day to day. My authority might have been revoked at any time, and I had no authority to make any permanent contracts."

While Attrill denies all knowledge of a contract, he admits the sale of the tar to the appellee, and his memory about the contract, is defective, as his knowledge about it then is clearly shown by the witnesses Smallwood and Smith. Attrill and Smallwood were the only persons in Baltimore who had charge of the interest of the appellant.

When both these parties united in agreeing to this contract, which was afterwards acted upon by the appellant, it is certainly now estopped from disputing their agency, or their authority.

The authority of Smallwood and Attrill to make such a contract, being thus, we think, established, the next and most important question, is whether there was a *fraudulent* withholding of the written contract, or a *fraudulent* refusal to sign such contract in accordance with the express agreement. Unless this appears the appellee would not be entitled to relief.

We have said that Smallwood and Attrill, for all the purposes of this case must be treated as having full authority to make the contract.

When the appellant commenced to make the coal tar, it was necessary to have it removed, and for that purpose the agent of the appellant, Smallwood, sent for the agent of the appellee, Smith, and made the agreement. The appellee did not seek the contract, but the appellant did. The bargain was made and concluded, the price and terms of payment were fixed, to the mutual satisfaction of the parties, and the appellee and appellant each went on to fulfil the contract. The agent of the appellant expressly agreed to sign or have signed the contract for five years. Small-

wood, in April, 1882, being about to sever his connection with the company, and knowing that he had promised the appellee this written contract, called his attention to it. Smith delivered the contract signed by himself for the appellee to Smallwood, who called Attrill's attention to it.

Both Smallwood and Attrill were satisfied, but the signing was postponed, as Attrill said he was in some doubt as to the proper party then to sign it. The appellee continued to take the tar, and pay the agreed price, until after Attrill became president of the company about six months afterwards. Then it was that Attrill demanded a higher price for the tar, and denied the existence of a contract, or if there was one, that it was made without authority. Finally, the appellant refused to continue to deliver the tar.

These facts amount to a fraudulent refusal to sign and deliver a written contract in compliance with an express agreement to do so. The refusal is without palliation, and the only excuse offered is that they wanted more for the tar.

The whole object of the appellee in fixing the price, and making his agreement, was a five year contract *in writing*, and this he was entitled to have.

Another objection raised, is that the appellee was a member of an association that had agreed among themselves to destroy a part of the coal tar that they purchased. If this was a proceeding between members of that association to enforce that agreement, the argument of the appellant would be entitled to due consideration. But the question whether such an agreement is contrary to public policy or not, does not, and cannot arise in this case. The maxim that he who comes into a Court of equity, must come with clean hands, is confined to his conduct, in the matter before the Court, and not to matters *aliunde*. Courts of equity, as well as Courts of law, will not refuse redress to the suitor because his conduct in

other matters, not then before them, may not be blameless. It is enough, if the suitor shows that he has acted justly, fairly and legally in the subject-matter of the suit, and not whether in the past he has always done so. The disposal of the tar by the appellee, after he had fairly purchased it, and paid for it, is a matter of no concern to the appellant, and upon which in this case, he cannot be heard.

The next and last point for consideration is, whether the rule laid down by the Circuit Court for the assessment of the damages is the correct rule?

It is undoubtedly true that the general rule for estimating damages in a case like this, would be the difference between the contract price, and the market price of the article, where it was to be delivered. If there was a market price for coal tar in Baltimore, and the appellee could go into the market and buy what tar he wanted, in the place of that withheld by the appellant, the measure of his damages would be the difference between his contract price and what he had to pay in the market. But it appears that there was no tar for sale in Baltimore that was available to the appellee. There is evidence tending to show that New York was the nearest point from which the appellee could get the amount of tar called for by his contract. And as the article is costly and inconvenient to transport, that it would cost about three times the contract price, to bring it from New York to Baltimore. If we applied the rule laid down in relation to coal, in *Grand Tower Co. vs. Phillips,* 23 *Wall.,* 471, it would work an injury to the appellant. In that case the Court said that the measure of damages would be the price the plaintiff paid for the coal at the nearest available market, *plus* the price of transportation. While this rule would do substantial justice for breach of contract for the sale of such an article as coal, which is constantly and easily transported, it might work great injustice in an

article, such as coal tar, which is costly and difficult to transport to any distance.

In *Woods' Mayne on Damages, sec.* 22, the rule is thus laid down: "But if they (the goods) cannot be purchased for want of a market, their value must be estimated some other way. If there has been a contract to re-sell them, the price at which such contract was made, will be evidence of their value."

In *France vs. Gaudet, L. R.*, 6 *Q. B.*, 199, the facts were somewhat similar to the case before us. In that case the plaintiff purchased a certain brand of champagne from the defendant, and *before* the delivery, re-sold the same at a large profit; the defendant refused to deliver the goods. There was no other champagne of that brand, then in London, where the sale and re-sale was made, and in consequence the plaintiff lost the re-sale of the goods. The Court held that the measure of damages was the profit on the re-sale, although these profits were very large, as the re-sale was made to a solvent customer.

*O'Hanlan vs. Great Western Ry. Co.*, 6 *Best & Smith*, 484, was an action against the railway company for non-delivery of goods; it was decided that in such action, the measure of damages was the price at which the goods could be obtained in the market, *if there was one*, at the place of delivery. If no such market there, the damages must be ascertained by taking into consideration in addition to the cost price, the *reasonable profit of the importer.*

We do not understand these cases to go to the extent of allowing any speculative or contingent profits, to be allowed in estimating the damages sustained by breach of contract, or any injury to the general business of the plaintiff. That is not allowed either in England, or in this State. See *Hadley vs. Baxendale*, 9 *Exch.*, 341, and *Balto. & Ohio R. R. Co., et al. vs. Pumphrey*, 59 *Md.*, 390.

In the case of *Eckenrode vs. The Chemical Co. of Canton*, 55 *Md.*, 51, the appellant agreed to purchase two

hundred tons of manufactured phosphate, of the plaintiff, at $25 p er ton. Eckenrode refused to perform his contract, and the Court held that the measure of damages was the difference between the *cost of manufacturing* the phosphate and the price he agreed to pay.

In the case before us, there was no general market for coal tar, and the market price could not therefore be fixed, by reference to the market. The question then arises, how is the loss sustained by the plaintiff, if any, to be ascertained? He manufactured the tar into oil and fuel, and sold it. The difference between the price he sold the manufactured article for, less the cost of manufacturing it, and what he gave for the tar in its crude state, would certainly represent his loss. Thus for example, if a ton of crude tar cost the plaintiff fifty cents, and the cost of manufacturing it was twenty-five cents, and when sold it brought $1, then the loss to the plaintiff would be twenty-five cents per ton; and this we understand to be the meaning of the decree below, and which is unobjectionable.

> *Decree affirmed, and*
> *case remanded.*

(Decided 10th March, 1886.)