615 A.2d 611

J. Stephen ADAMS

v.

Patricia J. MANOWN, etc.

No. 2, Sept. Term, 1992.

Court of Appeals of Maryland.

Nov. 23, 1992.

Daniel M. Press (Kaplan, Russin and Vecchi, Washington, D.C., and W. Bryan Hall and Carolyn B. Press of the Law Offices of W. Bryan Hall, Cumberland), all on brief, for petitioner.

Kenneth J. Mackley (Mackley, Gilbert & Marks, Hagerstown), both on brief, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Petitioner, a discharged bankrupt, sued the respondent for the repayment of numerous alleged loans, none of which were scheduled by the petitioner as assets of the bankruptcy estate. Petitioner obtained a verdict and judgment for one loan which had been made prior to bankruptcy. Relying on evidence that the omission of the loans from the schedules was intentional, the respondent sought a complete legal bar to the petitioner's recovery under the label, "unclean hands." The Court of Special Appeals agreed with the respondent, concluding that summary judgment in favor of the respondent should have been granted. *Manown v. Adams*, 89 Md.App. 503, 598 A.2d 821 (1991). We granted certiorari on a petition which asked us to determine whether the equitable defense of unclean hands applies to this action which, historically, is one at law. We shall hold, however, that the uncontradicted facts relied upon for the clean hands defense demonstrate that the trustee in bank-

ruptcy, and not the petitioner, is the real party in interest as plaintiff.

## I

J. Stephen Adams (Adams), the petitioner, is a freelance, professional photographer. His base of operations for that activity was Washington, D.C., where Adams traded, apparently as a sole proprietor, under the name, "Steve Adams Photography." Adams also owned a business in Oakland, Maryland, The Colour Company, Inc., which failed during the period relevant to this action. Garrett County Development Corporation had assisted in establishing The Colour Company through loans on which Adams was personally liable.

Adams and his wife separated in February 1986 after twenty-three years of marriage. He left the marital abode in Springfield, Virginia and took up residence in an A-frame building in Deer Park, Garrett County, owned by him and his wife.

In April 1986, Adams met Patricia J. Manown (Manown), the respondent. Manown, who was divorced, is a businesswoman whose background is in hotel and convention sales and tourism promotion. Adams and Manown began living together in September 1986. In July 1987, Adams and his wife executed a separation and property settlement agreement. They were divorced by decree of the Circuit Court for Garrett County in September 1987.

Also beginning in September 1986, Adams and Manown discussed combining his artistic talent and her business experience in a business venture. The concept was that Adams would photograph Garrett County scenes in different seasons, the scenes would be reproduced on souvenir items, and Manown would handle marketing and sales of the items.

The parties formalized their business relationship to the same extent that they solemnized their personal relationship. They called their business "North Star Design &

Publishing," (North Star). It was not incorporated. The Maryland Retail Sales Tax License was issued in the name of Manown, as North Star. Both Adams and Manown testified that their arrangement was a partnership in which each was to share equally in the profits. Postcards, calendars, and address books featuring photographs by Adams were produced for North Star and, to some extent, sold. There were no undistributed profits when the partnership and the personal relationship terminated. No party claims in this action for the value, if any, of the North Star inventory on hand at termination.

As early as the summer of 1986, Adams had begun accumulating cash by selling assets of The Colour Company. Adams avoided depositing significant sums of cash in his own name because, according to Manown, Adams anticipated a divorce action, and Adams was concerned that his creditors from The Colour Company would force him to seek protection under the Bankruptcy Code. On August 1, 1986, Adams transferred title to his boat to Manown, reciting a purchase price of $3,200 in the bill of sale. The parties both testified, however, that Manown paid nothing for the boat. Adams admitted that he transferred the boat to Manown so that his wife would not find out about it in the anticipated divorce proceedings. Adams did not list the boat as an asset on his financial statements filed in the divorce action. Manown later sold the boat for $2,000. Adams does not claim the value of the boat, or its proceeds, in the action *sub judice.*

North Star initially conducted operations out of a rented office in Hagerstown which North Star shared with Steve Adams Photography. In addition, Adams and Manown were paying rent on an apartment leased to Manown. To save money the parties decided to purchase a house in Frederick that was under construction. The intention was to use the premises for the activities of Adams's freelance photography business, for North Star, and as their dwelling. The contract to purchase was signed in Manown's name at a purchase price of $169,685. Of that price $43,000

was paid in cash which Adams had accumulated over some unspecified period of time, which he had kept in a safe deposit box, and which he had transferred to Manown, for deposit in her checking account, in increments of $5,000 to $10,000. At closing in February 1988, the deed to the house was taken in Manown's name only, and she alone obligated herself to repay the mortgage for the balance of the purchase price.

Adams filed a Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the District of Maryland on November 4, 1988. In his schedules filed in bankruptcy, Adams swore that he had no interest in property held by another and that he had no interest in any partnerships. He made oath that the only liquidated debt owing to him was $1,000, described by him as "[o]ne week's wages," and for which he claimed exemption. He denied owning any contingent or unliquidated claims of any type. His schedules reported debts of $190,000 and assets of $10,000, including those for which he claimed exemptions of $7,000. By the bankruptcy court's order of February 21, 1989, Adams was discharged. The bankruptcy case was closed.

The parties' relationship soured. Manown moved out of the Frederick home in March 1989, and Adams lived there until July 1989. Manown sold the house on October 13, 1989, for a gross selling price of $239,500 from which she netted $92,236.45 in cash at settlement. Manown testified that from these proceeds she used $23,000 to pay in full, with interest, certain outstanding loans, including loans for North Star from Adams's mother and from Manown's mother, $8,500 to purchase a new car, approximately $14,000 to pay capital gains taxes on the sale of the realty, and an unspecified amount to cover her legal fees.

## II

On June 26, 1989, Adams filed the instant suit against

Manown.[1]  The complaint presents the claims of Adams in eighteen counts, seventeen of which seek to recover alleged loans.  These seventeen counts each aver that the loan alleged therein had been made by Adams to Manown, or to Manown trading as North Star.  Some of these counts aver that the loans were made on specific dates while others claim total sums advanced incrementally over periods of time, including one period of seventeen months.  Count I claimed that the $43,000 used toward purchase of the house was a loan.  The other loan counts sought to recover sums expended by Adams in other aspects of the relationship between the parties.  The amounts claimed in all counts averring loans totalled approximately $92,000.  The final count, necessarily a claim in the alternative, alleged that North Star was a partnership between Adams and Manown which had terminated.  Relief sought in that count was that North Star should be dissolved with an accounting.  Adams prayed a jury trial.

Manown filed a motion for summary judgment seeking application as a matter of law of the clean hands doctrine and relying in particular on Adams's failure to schedule as assets in bankruptcy the claims which Adams was asserting against Manown.  The circuit court denied summary judgment, and the matter went to trial before a jury.

At his pretrial deposition Adams had refused to answer, on self-incrimination grounds, any questions directed to his

---

1. The complaint, and an amended complaint filed in September 1989, were brought by Adams and by his mother, Ethel L. Adams, as plaintiffs.  Count II asserted against Manown the claim of Ethel L. Adams based on a loan which is apparently the loan repaid by Manown out of the proceeds of sale of the Frederick house.  There is no docket entry that reflects disposition of the claim of the plaintiff, Ethel L. Adams.  Nor has the circuit court directed the entry of final judgment pursuant to Rule 2–602(b) as to the claims of Adams, which have been resolved by judgment.  Thus, there is no appealable judgment.  We exercise, however, our discretion under Rule 8–602(e)(1)(C) and hereby enter a final judgment on our own initiative as to the claims of Adams.

For purposes of simplicity, we shall discuss this action as if Adams were the sole plaintiff.

failure to schedule as assets in bankruptcy the claims asserted against Manown.  At trial Adams testified on the subject, saying that he had not included the loans, or any interest in North Star or in the Frederick house, as assets in bankruptcy because his counsel for the bankruptcy proceedings had advised him not to do so.[2]  Adams acknowledged on cross-examination that he had given "a lot of thought" to the possibility that he was subjecting himself to criminal penalties by failing to list the $43,000 loan or any interest in the house in Frederick.

Manown also introduced portions of two letters written by Adams to her after their relationship had terminated.  In one letter Adams said:

"I will await for the guy with the badge to knock on my door.  Like I have said before I have had the law knock on my door before.  It is very humiliating and degrading but I am ready to handle it."

Adams acknowledged that the reference was to the United States Marshal.  In the other letter Adams said, "And I am still willing to pay the price and go to jail."  Adams acknowledged the reference was to the possibility of going to jail for bankruptcy fraud.

At the conclusion of the defendant's case, in which Manown testified, she moved for judgment, without success.  Her motion incorporated, *inter alia*, the clean hands doctrine which she had argued in support of judgment at the

---

**2.**  The attorney whom Adams consulted concerning bankruptcy and who signed the bankruptcy petition is not Adams's counsel at trial or on appeal in the instant matter.

By objection to questions at trial, Manown preserved the contention that Adams, by refusing to give discovery on deposition by invoking the Fifth Amendment, should be precluded from testifying at trial on the same subject matter.  The motion and objections were overruled, and those rulings were argued by Manown to the Court of Special Appeals as grounds for reversal of the judgment in favor of Adams.  The Court of Special Appeals did not reach that argument, and we declined to grant Manown's cross petition for certiorari which raised that and other grounds not decided by the Court of Special Appeals.

close of the plaintiff's case.[3]

The circuit court submitted to the jury fourteen of the counts claiming monies loaned, including Count I, after granting Manown's motion for judgment as to Counts III, XIII, and XV. The circuit court also left to the determination of the jury whether to apply what the trial court called the "rule of law that applies in a situation where a person who is seeking the aid of the court has himself or herself been guilty of any conduct which violates the conscience or good faith or other equitable principle in prior conduct." The jury was told that "[w]hatever may be the nature of the claim the court may deny relief if the claim grows out of, or depends upon, or is connected with, any prior fraud." The jury was told that to apply the foregoing rule it "must find as a fact that there was a fraud, a fraudulent scheme, action contrary to law or public policy, and the parties are equal, *pari delicto,* and that the claim that might be denied can be directly arising out of that misconduct."

Adams excepted to those instructions solely on the ground that the clean hands doctrine does not apply at law. Adams did not have any criticism of the content of the instruction. Manown excepted because she understood the jury to have been told that it could or could not, in its discretion, apply the rule described by the circuit court. It was Manown's position that, if the jury found the facts to be within the rule described in the instruction, then the jury must find for the defendant.

The circuit court further instructed the jury to return a general verdict. Neither party excepted to that mode of

---

3. At the close of the entire case, counsel for Adams also moved for judgment, with respect to the count seeking a partnership dissolution and accounting. Counsel pointed out that both parties had agreed in their testimony that their business relationship was that of general partners. The trial court denied that motion. Adams took no cross appeal to the Court of Special Appeals, and has not argued on appeal that the ruling on the claim for an accounting was erroneous. Thus, in this opinion, we shall look only at the claims of Adams asserting causes of action for the repayment of loans made to Manown in her individual capacity.

submission. The jury returned a verdict of $43,000 in favor of Adams on which the court entered judgment disposing of all fourteen counts submitted to the jury.

■ Manown appealed to the Court of Special Appeals which reversed. *Manown,* 89 Md.App. 503, 598 A.2d 821. The court concluded that the clean hands doctrine applies at law, relying on *Messick v. Smith,* 193 Md. 659, 69 A.2d 478 (1949) and *Shirks Motor Express Corp. v. Forster Transfer & Rigging Co.,* 214 Md. 18, 133 A.2d 59 (1957). The intermediate appellate court then concluded that, as a matter of law, the doctrine completely barred Adams's claims.[4]

In reaching its holding, the court gave no legal effect to Adams's testimony that his failure to disclose his claims as assets in bankruptcy were advised by counsel. 89 Md.App. at 514–16, 598 A.2d at 826–27. The court relied on evidence demonstrating that Adams had not relied in good faith on the advice allegedly given; rather, Adams had comprehended the potential consequences of his omissions. The Court of Special Appeals also observed that it could not say "for certain whether the jury actually found for Adams only on Count I;" because of the general verdict. *Id.* at 510 n. 5, 598 A.2d at 824 n. 5.

Both parties petitioned for the writ of certiorari. We granted Adams's petition and denied that of Manown.

---

**4.** In procedural terms, the Court of Special Appeals held "that the circuit court abused its discretion in denying Manown's motion for summary judgment." 89 Md.App. at 516, 598 A.2d at 827. We do not agree with that analytical framework even though the Court of Special Appeals concluded that the instant matter was "not a case where the trial on the merits turned up evidence or resulted in factual findings contrary to what the moving party asserted in her motion for summary judgment." *Id.* at 514, 598 A.2d at 826. Given that a circuit court has the discretion to deny a motion for summary judgment, even though the record on summary judgment would support grant of the motion at that time, *see Metropolitan Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 28, 415 A.2d 582, 583 (1980), the correct mode of analysis here is to determine whether the party moving for judgment at the conclusion of trial is entitled to judgment as a matter of law on the record as it stands at that time.

## III

■ At issue here is whether Adams is entitled to all or none of the $43,000 judgment entered on the jury verdict. Adams does not seek a new trial based on the circuit court's alleged error in having given a clean hands instruction in a "law" action. Adams's objective on certiorari is only to retain the $43,000 judgment.

Under the evidence, jury instructions, and arguments in the particular case before us, it is clear that the verdict properly can be analyzed as a verdict rendered only on Count I of the amended complaint. The claim on the loan in that count is precisely $43,000. The trial court defined for the jury a "loan" as the delivery and receipt of a sum of money upon an express or implied agreement to repay the money with or without interest. No combination of claimed loans in any other counts totals $43,000. Under the evidence and the arguments of counsel, the entire amount claimed in a particular count either was, or was not, a loan by Adams to Manown. No issue was generated by the evidence under which part of the amount claimed in a given count could be considered by the jury as a loan, and part of the amount claimed in a given count could be rejected by the jury as a loan, so that any amounts awarded by the jury on various counts, when totalled, might coincide by happenstance with the $43,000 claim asserted in Count I. The award of $43,000 is by design, representing the jury's finding that the $43,000 contribution to the cost of the house was a loan.

More important, after instructing the jury that it would be asked to find for the plaintiff or defendant, and, if for the plaintiff, to state in what amount, the trial judge further instructed:

"And it is the burden as I indicated before for Mr. Adams to prove his claim or claims by a preponderance of the evidence. And you would apply that standard to each one of these various counts to come to your ultimate conclusion."

The instructions then reviewed the amended complaint, count by count, as to each of the fourteen counts being submitted. The trial judge stated the total amount claimed on a count and referred the jury to the documentary evidence associated with the claim asserted in the count then being reviewed in the instructions. In the concluding segment of the instructions the jury was told:

"If you would find for the Plaintiff Adams that he has sustained his burden on one or more of the claims that I have outlined for you of establishing a loan relationship ... then you would further be asked the question, 'What damages do you assess?' "

Thereafter counsel for Manown, in arguing that she came away with nothing from her relationship with Adams, conceded that "the house" was the exception to that analysis of the evidence.

Under these circumstances we shall treat the general verdict as if it were a verdict for Adams on Count I and a verdict for Manown on the remaining counts submitted. Consequently, we shall consider the evidence in support of the claim in Count I most favorably to Adams while reviewing the Court of Special Appeals's reversal of the judgment in favor of Adams. Further, under the evidence most favorable to Manown on those counts where the verdict was in her favor, the jury's decision not to award any amount to Adams can be considered to have been based on the lack of any expectation of repayment at the time of the contribution by Adams to some activity of the parties. For that reason we shall not consider those counts to be implicated in the clean hands defense.

## IV

Manown's clean hands defense to Count I, even if applicable to a claim "at law," cannot be predicated on Adams's transfer of the boat to Manown in fraud of the potential claims against him by his wife in their anticipated divorce action. The clean hands doctrine is not applied for the protection of the parties nor as a punishment to the

wrongdoer; rather, the doctrine is intended to protect the courts from having to endorse or reward inequitable conduct. *Space Aero Prods. Co. v. R.E. Darling Co.*, 238 Md. 93, 120, 208 A.2d 74, 88, *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965); *Niner v. Hanson*, 217 Md. 298, 309, 142 A.2d 798, 803 (1958). "It has also been said that the maxim has nothing to do with disapproval of the character or past behavior of the applicant but only with the effect of his present application." *Niner*, 217 Md. at 309, 142 A.2d at 803. " 'Equity does not demand that its suitors shall have led blameless lives.' " *Id.* (quoting *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219, 1227 (1934)). Thus, an important element of the clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief.

In *Niner*, 217 Md. 298, 142 A.2d 798, the plaintiff sought to compel the carpenters' union to recognize him as a member and to enjoin them from interfering with his membership. *Id.* at 302, 142 A.2d at 799–800. The union raised the clean hands defense. Prior to becoming a member in the union, the plaintiff had adopted a friend's identity and used the friend's membership card to get union work; the plaintiff had defied union obligations after becoming a member in his own right; and the plaintiff had committed perjury in a prior lawsuit between the local and international unions. *Id.* at 309, 142 A.2d at 803.

> In refusing to apply the clean hands doctrine, we stated: "The relief sought was in no way predicated upon the misconduct. It has been held in a number of well considered cases that dismissal is not required even where the complainant was guilty of fraud, perjury or suppression of evidence, where the wrongdoing does not result in benefit to the wrongdoer, or operate as a fraud or imposition upon the court in which relief is sought."

*Id.* at 310–11, 142 A.2d at 804.

See also, in this state, *Thomas v. Klemm*, 185 Md. 136, 142, 43 A.2d 193, 197 (1945); *Baltimore Humane Impar-*

*tial Soc'y & Aged Women's & Men's Homes v. Marley,* 156 Md. 478, 482, 144 A. 521, 522 (1929); *Equitable Gas Light Co. v. Baltimore Coal Tar and Mfg. Co.,* 65 Md. 73, 84–85, 3 A. 108, 111 (1886), and elsewhere, *Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL–CIO,* 227 Cal. App.2d 675, 39 Cal.Rptr. 64, 98 (1964) (applying the maxim where the claim sued upon is independent of the unclean hands conduct "would be to sanction an assault upon a person who has perpetrated a fraud upon or breached a contract with the assaulter").

D. Dobbs, *Remedies* § 2.4, at 46 (1973) puts the concept as follows:

> "It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct. 'What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.' "

(Footnote omitted).

In the instant matter Adams does not claim the value of the boat from Manown. Any fraud committed by Adams in concealing the existence of the boat from his wife in the divorce proceedings is independent of Adams's claim against Manown for the $43,000 used toward purchase of the Frederick house.

## V

■ The principal predicate of Manown's clean hands argument is Adams's apparently intentional concealment of assets in bankruptcy. The $43,000 which the jury found Manown had borrowed from Adams became outstanding no later than February 1988 when the Frederick house was purchased. Adams filed under Chapter 7 of the Bankruptcy Code, 11 U.S.C. (1988) (the Code), in November 1988, without scheduling the $43,000 loan as an asset. After the bankruptcy case was closed, and after he had been dis-

charged, Adams sued for repayment of the loan. Manown's defense—Adams's concealment of the loan in bankruptcy—seeks to prevent a judgment for repayment, with the result that Manown would be left as the effective owner of the $43,000. By raising cries of unclean hands and *in pari delicto*, Manown has successfully presented this case as if the only alternatives were either to give Adams the benefit of his fraud or to give Manown the benefit of a windfall. What has become obfuscated through two levels of courts is that those who are entitled to benefit from the judicial determination of Manown's indebtedness to Adams are the creditors of Adams. His trustee in bankruptcy is the real party in interest in the instant case. It is not too late to apply and carry out the correct analysis.

When Adams filed his voluntary petition, it created a bankruptcy estate, comprised of all of the property described in Code § 541(a), "wherever located and by whomever held," including "(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case." "Within this definition of a debtor's property fall the debtor's rights of action to collect accounts receivable." *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir.1990); *In re Smith*, 640 F.2d 888, 892 (7th Cir.1981) ("*All* causes of action become property of the estate under section 541."); *see 4 Collier on Bankruptcy* § 541.10[1], at 541–66 (15th ed. 1992).

Here, the trustee who was appointed by the United States Trustee under Code § 701 did not know of the $43,000 loan to Manown because it was not scheduled. Had the trustee known, it would have been the trustee's responsibility either to cause the claim to be pursued on behalf of the estate or to abandon the claim. Abandonment could be effected by express decision or court order, Code § 554(a) and (b), or pursuant to § 554(c) which reads:

"Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to

the debtor and administered for purposes of section 350 of this title."

■ Property which has not been scheduled is not abandoned by the trustee simply because the estate is closed. This principle has long been settled. *First Nat'l Bank of Jacksboro v. Lasater,* 196 U.S. 115, 25 S.Ct. 206, 49 L.Ed. 408 (1905), involved the debtor's post bankruptcy action on an unscheduled usury claim on which a state court judgment for the debtor had been entered. Speaking in terms of the theory of the then Bankruptcy Act under which a trustee elected whether to take property, and after recognizing that the bankrupt could assert title to abandoned property, the Court said:

"But that doctrine can have no application when the trustee is ignorant of the existence of the property, and has had no opportunity to make an election. It cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property, can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it. If the claim was of value (as certainly this claim was, according to the judgment below), it was something to which the creditors were entitled, and this bankrupt could not, by withholding knowledge of its existence, obtain a release from his debts, and still assert title to the property."

*Id.* at 119, 25 S.Ct. at 208, 49 L.Ed. at 409. Judgment for the debtor was reversed and the case remanded for further proceedings.

Cases decided under the Code are to the same effect. *Krank v. Utica Mutual Ins. Co.,* 109 B.R. 668 (E.D.Pa.), *aff'd without opinion,* 908 F.2d 962 (3d Cir.1990), is in point. The plaintiff's alleged cause of action for wrongful cancellation of a malpractice policy accrued no later than 1983. The claim was not scheduled in the plaintiff's 1986 voluntary bankruptcy which resulted in a 1989 discharge. The court analyzed the facts as follows:

"If a trustee chooses to abandon a claim or is ordered to do so, the debtor may assert title to the cause of action and bring suit upon it. If, however, the debtor fails to list a claim as an asset, the trustee cannot abandon the claim because he or she will have had no opportunity to determine whether it will benefit the estate. In such circumstances, the debtor may not claim abandonment and seek to enforce the claim after discharge[.]

. . . .

"Instead, the debtor must petition the bankruptcy court to reopen proceedings to allow that court to decide whether the trustee should enforce the claim for the benefit of creditors or abandon it. *Stein v. United Artists [Corp.]*, 691 F.2d 885 (9th Cir.1982).

"In the case at bar, plaintiff may not assert his cause of action in the absence of proof of abandonment: his cause of action remains an asset of the estate."

*Id.* at 669 (citation omitted). To the same effect, see *Lambert v. Fuller Co.*, 122 B.R. 243, 246 (E.D.Pa.1990); *Harris v. St. Louis Univ.*, 114 B.R. 647, 649 (E.D.Mo.1990); *Cain v. Hyatt*, 101 B.R. 440, 442 (E.D.Pa.1989); *In re Louden*, 106 B.R. 109, 112 (Bankr.E.D.Ky.1989); *In re Lake*, 49 B.R. 715, 717 (Bankr.S.D.Fla.1985); *In re Crandall*, 1 B.R. 752, 755 (Bankr.W.D.Mich.1980); *Weiner v. United States*, 15 Cl.Ct. 43, 45–46 (1988); *Schlosser v. Bank of W. Ind.*, 589 N.E.2d 1176, 1179 (Ind.Ct.App.1992); *McDonald v. Fairfield Pathologists, Inc.*, 580 N.E.2d 690, 692–93 (Ind.Ct.App.1991); *Marciszewski v. Hoselton Datsun, Inc.*, 115 A.D.2d 264, 495 N.Y.S.2d 839, 839–40 (1985).

The rule was the same under the Bankruptcy Act. *See, e.g., Management Investors v. United Mine Workers of America*, 610 F.2d 384, 392 (6th Cir.1979); *Moore v. Slonim*, 426 F.Supp. 524, 526–27 (D.Conn.), *aff'd without opinion*, 562 F.2d 38 (2d Cir.1977); *Riverside Memorial Mausoleum, Inc. v. UMET Trust*, 469 F.Supp. 643, 644–45 (E.D.Pa.1979); *Binnick v. AVCO Financial Servs. of Nebraska, Inc.*, 435 F.Supp. 359, 361–62 (D.Neb.1977); *Hermsmeyer v. A.L.D., Inc.*, 239 F.Supp. 740, 741 (D.Colo.1964);

*Dynamics Corp. of America v. Marine Midland Bank-New York*, 69 N.Y.2d 191, 195–97, 513 N.Y.S.2d 91, 92–94, 505 N.E.2d 601, 603–04 (1987).

Manown's indebtedness to Adams, and Adams's claim thereon, were neither administered nor abandoned by the trustee in bankruptcy, and the asset has, throughout these proceedings in courts of the State of Maryland, been property of the bankruptcy estate. Code § 554(d) ("[P]roperty of the estate that is not abandoned ... and that is not administered in the case remains property of the estate."). Thus, we are faced with an action which has not been brought by the real party in interest under Maryland Rule 2–201.

"Notwithstanding its permissive origins, Rule 2–201 does have a mandatory component. If the party bringing an action is not the real party in interest, the action may be dismissed, provided a reasonable time is allowed after objection 'for joinder or substitution of the real party in interest.' "

*South Down Liquors, Inc. v. Hayes*, 323 Md. 4, 8, 590 A.2d 161, 163 (1991).

One requirement of justiciability is that the plaintiff have standing in the sense that the person is entitled to invoke the judicial process in a particular instance. *Reyes v. Prince George's County*, 281 Md. 279, 288, 380 A.2d 12, 17 (1977). We notice the absence of justiciability on our own initiative. *Id.; County Council of Harford County v. Maryland Reclamation Assocs., Inc.*, 328 Md. 229, 614 A.2d 78 (1992); *see also Kreatchman v. Ramsburg*, 224 Md. 209, 215–16, 167 A.2d 345, 348–49 (1961); *Wagner v. Freeny*, 123 Md. 24, 30–31, 90 A. 774, 775–76 (1914); *McDonald v. Workingmen's Bldg. Assoc.*, 60 Md. 589, 590 (1883); E. Miller, *Maryland Equity Procedure* § 354, at 429 & n. 1 (1897).

## VI

Under the unusual circumstances of the instant case it would not be in the interest of justice to vacate the judgment and dismiss the claim. Rather, substitution of

the real party in interest is appropriate. Under Rule 2–201, "[t]he real party in interest simply steps into the shoes of the plaintiff who commenced the action." P. Niemeyer & L. Richards, *Maryland Rules Commentary* 92 (1984). Accordingly, we shall exercise our discretion under Rule 8–604(d) and direct remand to the Circuit Court for Washington County for further proceedings, as hereinafter specified.

Upon receipt of the mandate in this case the circuit court shall send notice by ordinary mail, together with a copy of this opinion, to the Assistant United States Trustee, 1 Metro Circle, 51 Monroe Street, Plaza Level 2, Rockville, Maryland 20850, advising the United States Trustee that the circuit court will stay further proceedings in this action for sixty days following service of the notice on the United States Trustee, or for such longer period as the circuit court, in its discretion, may allow. The purpose of the stay is to allow the United States Trustee to determine whether the bankruptcy estate of John Stephen Adams, No. 88–43240–BKC–SD should be reopened pursuant to Code § 350(b) in order to administer an asset, that is, the judgment of the Circuit Court for Washington County for $43,000 in favor of Adams against Manown in this action, No. 16144 Civil. If a trustee for the reopened estate determines to administer the asset and moves to intervene as the real party in interest in No. 16144 Civil, the circuit court shall allow that intervention, substitute the trustee for Adams, and enter the judgment standing in the name of Adams against Manown as a judgment in the name of the trustee in bankruptcy of Adams. If no trustee in bankruptcy is appointed, or if the trustee abandons or otherwise determines not to administer the asset, then the circuit court should proceed by treating Adams as the real party in interest and terminate the stay. In that event the judgment is to stand in the name of Adams against Manown.

## VII

The foregoing disposition moots Manown's contentions, even if clean hands applies "at law." As we have pointed

out above, the policy underlying the clean hands doctrine is institutional. The objective is to prevent the court from assisting in fraud or other inequitable conduct; the purpose is not to punish a party for past misconduct. If a trustee, as representative of Adams's creditors, with the approval of the Bankruptcy Court to the extent approval is required under the Code, abandons the known asset, Maryland courts will not be assisting fraudulent conduct by enforcing the judgment. If the trustee is substituted for Adams, there is no longer a clean hands issue in the case.

For these same reasons the issues which Manown raised in the Court of Special Appeals, but which were not decided there, are also moot. Following remand, the contention by Manown that the jury was erroneously allowed, in its discretion, to decide whether to apply the clean hands maxim, will no longer be in the case. If a trustee in bankruptcy holds the judgment, the party who committed the fraud will not benefit from the judgment. If a trustee in bankruptcy declines to administer the asset, the circuit court will not be assisting in the fraud. Any fraud on Adams's part will have been attenuated by the inaction of the United States Trustee in disregarding the notice from the circuit court, or by a deliberate decision on the part of a trustee appointed for the estate of Adams to abandon the asset.

Manown's second point which was not explicitly decided by the Court of Special Appeals is that Adams should have been precluded at trial from testifying concerning circumstances surrounding his omission of assets from his bankruptcy schedule. Preclusion was sought on the ground that Adams refused on deposition to testify concerning those omissions by invoking his privilege against self-incrimination. The testimony by Adams at trial to which Manown objects is that the loans to, or claims against, Manown were not reported because counsel so advised. The jury may have concluded that Adams's unclean hands conduct with respect to the $43,000 loan was excused because of the advice of counsel. The disposition under our remand, however, does not depend upon whether the jury believed that

bankruptcy counsel advised Adams to conceal assets nor upon whether the jury believed that the advice prevented Adams from acting with unclean hands. Our disposition starts with the premise that Adams committed a fraud on the Bankruptcy Court, but our remand insulates the judgment in this case from that fraud.

JUDGMENT OF THE COURT OF SPECIAL APPEALS, REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY, VACATED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THIS ACTION TO THE CIRCUIT COURT FOR WASHINGTON COUNTY PURSUANT TO RULE 8-604(d)(1) WITHOUT AFFIRMANCE OR REVERSAL AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THE OPINION OF THIS COURT. THE PETITIONER, J. STEPHEN ADAMS, AND THE RESPONDENT, PATRICIA J. MANOWN, SHALL EACH BEAR THEIR OWN COSTS IN THIS COURT. COSTS IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PATRICIA J. MANOWN.

Concurring and dissenting opinion by CHASANOW, J., in which ROBERT M. BELL, J., joins.

CHASANOW, Judge, concurring and dissenting, in which ROBERT M. BELL, joins.

The majority in the instant case, in order to reach what it deems a proper result, takes action, which in kindness to my colleagues I will only characterize as unique and unprecedented.

The Court, after acknowledging that we granted certiorari to consider the issue of "whether the equitable defense of unclean hands applies to this action which, historically, is one at law," goes on to decide the case on a totally different issue, *i.e.*, "that the trustee in bankruptcy, and not the petitioner, is the real party in interest as plaintiff." 328 Md. 463, 465–66, 615 A.2d 611, 612 (1992). One of the first things that makes this unusual is that the issue upon which

the Court decides this case was never raised or discussed in the trial court; never raised, briefed, or argued in the Court of Special Appeals; and never raised by the parties, briefed, or argued in this Court. Indeed the first time either litigant will have any opportunity to learn of this issue will be when they read the opinion of this Court.

Before deciding that the trustee in bankruptcy for the new discharged debtor is the real party in interest, I believe Adams should be given an opportunity to be heard on the issue. I am willing to accept, arguendo, the majority's conclusion that the trustee is the real party in interest and proceed from there. The Court goes on to make the trial judge a sort of ombudsman and orders the judge to send notice "by ordinary mail" to an address and zip code supplied by this Court. The Court further holds that the trustee in bankruptcy *nunc pro tunc* will apparently cease to be a real party in interest if the trustee does not affirmatively respond within sixty days to the letter mailed by the trial judge. If failure to join the trustee in bankruptcy constitutes such a gross defect in the proceeding that it was not waived by the parties and can be raised *sua sponte* by this Court on appeal, it would seem that the judgment is void and the non-joinder cannot be cured simply because the trustee fails to respond within sixty days to a letter mailed by the trial judge.

Courts, particularly appellate courts, are often torn between their desire to develop new and innovative solutions to legal problems and their desire to maintain stability and predictability in the law. Where this Court enters waters not charted for us by the parties and not navigated by either the trial court or the intermediate appellate court, we should do so most cautiously. I am troubled by the novel procedure the court *sua sponte* formulates to deal with the issue. The majority cites no authority for requiring the trial judge rather than the parties to provide notice to the real party in interest and to do so by ordinary mail (together with a copy of the Court's opinion). The majority cites no authority for holding that the real party in interest must

respond to the Court's letter within sixty days or be deemed
to no longer be the real party in interest. The majority
acknowledges that, under the provisions of the Bankruptcy
Code and the cases cited, the only way the trustee could
abandon this unscheduled property would be by "express
decision or court order," 328 Md. at 477, 615 A.2d at 618,
but it then apparently directs that the trustee will be
deemed to have abandoned the claim by failing to respond
to a circuit court letter within sixty days.

When and how a trustee in bankruptcy abandons a claim
of the bankruptcy estate is obviously a matter of federal,
not state law. It is inappropriate for this Court to decide
that a trustee in bankruptcy's claim or any real party in
interest's claim will be abandoned if the real party in
interest does not respond within sixty days to a letter sent
by ordinary mail from the circuit court stating that a suit
was filed and judgment was obtained by someone not
entitled to bring the action. *See* 4 *Collier on Bankruptcy*
§ 554.03, at 554–13 (15th ed. 1992) ("Unless the [bankrupt-
cy] court orders otherwise, formally unabandoned and unad-
ministered property that was not scheduled thus 'remains
property of the estate.' If the property is valuable, the
court may reopen the case; if it is not, the court may order
the property to be abandoned without reopening the case
and without incurring additional expense.").

There is a procedure, perhaps less efficient, and certainly
less novel and unique, which can be found in the rules that
this Court has propounded. That procedure is to remand
the case to the trial court with instructions to stay further
proceedings for a reasonable time to give Adams an oppor-
tunity to either join the trustee in bankruptcy, establish that
the trustee has abandoned the claim, or prove the trustee in
bankruptcy is not the real party in interest. Maryland Rule
2–201 provides in pertinent part:

"Every action shall be prosecuted in the name of the
real party in interest.... No action shall be dismissed on
the ground that it is not prosecuted in the name of the
real party in interest until a reasonable time has been

allowed after objection for joinder or substitution of the real party in interest. The joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."

Adams may be able to establish the trustee is not the real party in interest for at least part of this claim in light of his testimony in the court below. To rebut the unclean hands defense, Adams testified that, although he listed $117,125 in potential debts, most of these were not actual debts since they included claims for merchandise that was returned by Adams, the mortgage on his wife's home, and other debts which were ultimately paid. Adams further testified the actual indebtedness discharged by the bankruptcy was only $8,000.

If the trustee in bankruptcy is, in fact, the real party in interest, then Adams is not entitled to a judgment. If Adams does not join or substitute the trustee in bankruptcy or does not prove an abandonment by the trustee, then the trial court should follow the established procedure when a plaintiff fails to join or substitute the real party in interest—the court should dismiss Adams' claim. Manown would not necessarily receive a windfall as the result of the dismissal. The trustee in bankruptcy would retain the right to proceed against Manown since the unscheduled loan by Adams to her remains an asset of the bankrupt estate.[1]

I should also point out that Adams only obtained judgment for approximately half the money he claimed was due him from Manown. This might indicate that the jury compromised Adams' claim. If the trustee in bankruptcy rather than Adams is the real party in interest, then the trustee should have the option of being substituted for Adams and accepting the $43,000 judgment or vacating the judgment and suing Manown for the entire $92,000.

---

**1.** If the members of the Court are concerned that Adams may not notify the trustee in bankruptcy, it seems more efficient for this Court to mail the trustee a copy of its opinion rather than direct the trial court to do so.

Finally, I believe the court should address the issue which was decided by the Court of Special Appeals, *i.e.*, that as a matter of law Adams had "unclean hands" and was barred from recovering in the instant case. If, according to the majority opinion, the trustee in bankruptcy fails to respond to the court's sixty day letter, then this will be considered a post-judgment abandonment of the trustees claim. The majority goes on to, in effect, hold that the trustee's post-judgment abandonment retroactively washes Adams' "unclean hands." It seems to me that the "unclean hands" doctrine simply was not applicable even based on the circumstances that existed at the time of trial, regardless of whether post trial the trustee decides not to pursue assets fraudulently concealed by Adams.

The somewhat analogous doctrine of *in pari delicto* rather than "clean hands" is applicable when a litigant is seeking relief at law, as in the instant case. The equitable defense of unclean hands is applicable only when a litigant is seeking relief which is equitable in nature. *See, e.g., Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 449, 55 S.Ct. 444, 447, 79 L.Ed. 982, 986 (1935) (the maxim that one who comes into equity must come with clean hands is inapplicable if one is not seeking equitable relief).

*Messick v. Smith,* 193 Md. 659, 69 A.2d 478 (1949), which was relied on by Manown, did not hold that the clean hands doctrine was applicable in law as well as in equity. The actual holding in that case was simply that the doctrine of *in pari delicto*, which is quite similar to the equitable doctrine of clean hands, was applicable. We stated:

> [W]hen plaintiff and defendant have participated in fraudulent or illegal conduct, contrary to law or public policy or in fraud of the law itself, and are *in pari delicto*, plaintiff cannot maintain suit—at law or in equity—directly arising out of the misconduct. (Emphasis added, citations omitted).

*Id.* at 669, 69 A.2d at 481. This Court later reiterated in *Shirks Motor Express Corp. v. Forster Transfer & Rig-*

*ging Co.*, 214 Md. 18, 133 A.2d 59 (1956) that *Messick* dealt with the defense of *in pari delicto*. We stated:

> "In [*Messick v. Smith*], it was held in an opinion by Judge Markell, who went into the question of *pari delicto* in detail, that the plaintiff was barred from suing [on his mechanic's lien] on the ground that when the plaintiff and defendant participated in fraudulent or illegal contracts contrary to law or public policy, he was *in pari delicto* and the plaintiff could not maintain a suit in law or equity directly arising out of misconduct."

*Id.* at 29–30, 133 A.2d at 65. In addition, in the case of *Schaeffer v. Sterling*, 176 Md. 553, 6 A.2d 254 (1939), we stated that when applying the clean hands doctrine an equity court "will leave [the complainant] to whatever remedies he may have *at law.*" *Id.* at 555, 6 A.2d at 255 (emphasis added).

Other courts agree that the unclean hands defense has no place in an action at law. For example, the District of Columbia Court of Appeals in *Truitt v. Miller*, 407 A.2d 1073 (D.C.1979), held:

> "Although 'unclean hands' is a companion principle to the doctrine of *in pari delicto*, *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1156–57 n. 9 (3d Cir.1977), it has no applicability in an action for damages."

*Id.* at 1079–80; *see also Ligon v. E.F. Hutton & Co.*, 428 S.W.2d 434, 437 (Tex.Civ.App.1968) ("This reference to a time-honored equitable maxim ["clean hands"] has no proper application here and presents no defense to this common-law action."); *Furr v. Hall*, 553 S.W.2d 666, 672 (Tex.Civ. App.1977) ("the 'clean hands' maxim is strictly an equitable doctrine not applicable outside equitable proceedings."); *Fellner v. Marino*, 4 Misc.2d 16, 158 N.Y.S.2d 24, 32 (Mun.Ct.1956) ("there is very slight distinction between the doctrine of clean hands in equity and the doctrine of *in pari delicto* used as a defense in actions at law").

Maryland Rule 2–301 merged law and equity procedurally; it did not change the substantive distinctions between law and equity. The availability of equitable remedies and

defenses remains unchanged. For example, jury trials are only available in actions at law, not equitable actions. *Higgins v. Barnes,* 310 Md. 532, 530 A.2d 724 (1987). This Court should not make equitable defenses such as the clean hands doctrine or the doctrine of laches applicable to actions which were traditionally actions at law rather than actions in equity. I believe the Court of Special Appeals erred in holding that the clean hands doctrine was applicable and that as a matter of law Adams had unclean hands. The defense of *in pari delicto* was not raised and, indeed, does not seem applicable. In ascertaining whether *in pari delicto* is applicable, the court looks to conduct associated with the transaction before it, and should not forbid recovery on account of a plaintiff's activities in a separate setting. *See, e.g., Tarasi v. Pittsburgh Nat. Bank,* 555 F.2d 1152, 1157 (3d Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977).

I would remand the case to the trial court with instructions to hold a hearing to determine whether the trustee in bankruptcy is the real party in interest. If so, further proceedings should be stayed for a reasonable period. If, following the stay, Adams does not either join or substitute the trustee in bankruptcy as a plaintiff, then the judgment should be vacated and the case dismissed. Manown, though not liable to Adams for the $43,000 "loan," nevertheless would hold the loan proceeds subject to any claim by Adams' trustee in bankruptcy.

BELL, J., has authorized me to state that he agrees with the views expressed herein.